**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **DANIELLE SIMPSON,** | § | |
| Petitioner, | § | |
| vs. | § | No. 1:04-CV-485 |
| **NATHANIEL QUARTERMAN, Director**, | § | |
| Texas Department of Criminal Justice, | | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION

Petitioner Danielle Simpson, ("Simpson"), an inmate confined in the Texas Department of Criminal Justice, Correctional Institutions Division, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Simpson challenged his capital murder conviction and death sentence imposed by the 3rd Judicial District Court of Anderson County, Texas, in cause No. 25200, styled *The State of Texas v. Danielle Simpson.*  Having considered the circumstances alleged and authorities cited by the parties, and having reviewed the record, the Court finds that the petition should be denied.

### Facts

During the morning of January 26, 2000, Simpson, his wife, and his thirteen-year-old cousin were burglarizing the house of Geraldine Davidson, an elderly woman, when she came home.  The burglars bound and gagged Ms. Davidson with duct tape and put her in the trunk of her car.  Simpson then drove the car to visit several friends, occasionally opening the trunk and showing them the bound woman.  Later, Simpson's brother joined the trio and suggested that they kill Ms. Davidson.  Simpson and his

brother beat Ms. Davidson, then tied a cinder block brick to her ankles and threw her into the Neches River.

## Procedural History

On February 17, 2000, Simpson was indicted for capital murder and lesser-included offenses. Simpson was convicted of capital murder and sentenced to death.  The conviction and sentence were affirmed on direct appeal.  *Simpson v. State*, 119 S.W.3d 262 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004).  Simpson filed a state application for post-conviction relief, which was denied on June 30, 2004.  *Ex parte Simpson*, 136 S.W.3d 660 (Tex. Crim. App. 2004).  On June 28, 2005, Simpson filed this petition for writ of habeas corpus.

## Issues

Simpson raised thirty-eight claims for relief in his petition:

1.  The prosecution's use of peremptory challenges to remove potential jurors who were African-American denied Simpson the equal protection of the laws.

2.  The trial court's admission of hearsay statements made by a co-defendant denied Simpson the right to confront witnesses against him.

3.  The state court unreasonably concluded that the admission of hearsay statements was harmless beyond a reasonable doubt.

4.  The admission of hearsay statements against Simpson had a substantial and injurious effect or influence on the jury's determination of their verdict in both the guilt/innocence phase and the punishment phase of his trial.

5.  The trial court's failure to allow defense counsel an opportunity to rehabilitate a potential juror constituted a structural error which violated Simpson's right to an impartial jury.

6.  The Texas Court of Criminal Appeals erred in finding that the trial court's refusal to allow Simpson to rehabilitate a potential juror was a nonconstitutional error.

7.  The Texas Court of Criminal Appeals' failure to properly apply state law in analyzing Simpson's claim that the trial court erred in refusing to allow his counsel to rehabilitate a potential juror deprived him of the due process of the law.

8.  Simpson's death sentence constitutes cruel and unusual punishment because he is mentally retarded.

9.  The trial court's failure to require that a jury determine beyond a reasonable doubt that Simpson was not mentally retarded denied him the due process of law.

10.  Simpson was denied the due process of law by the use of a jury instruction that did not require that the prosecution prove his future dangerousness beyond a reasonable doubt.

11.  Simpson was denied the due process of law by the use of a jury instruction that did not require the prosecution to negate mitigation beyond a reasonable doubt.

12.  Simpson was denied the due process of law when the trial court admitted unreliable expert testimony about prison violence.

13.  Simpson was denied the equal protection of the laws when the trial court admitted unreliable expert testimony about prison violence.

14.  The admission of unreliable expert testimony about prison violence renders Simpson's death sentence cruel and unusual punishment.

15.  Simpson was denied the due process of law when the prosecution failed to disclose exculpatory evidence.

16.  Simpson was denied the effective assistance of counsel at his trial.

17.  Executing Simpson would constitute cruel and unusual punishment because he is mentally incompetent.

18.  Simpson's death sentence constitutes cruel and unusual punishment because the evidence submitted at the punishment phase of his trial was legally insufficient to support the jury's finding of future dangerousness.

19.  Simpson was denied the due process of law by the use of jury instructions at the punishment phase of his trial that gave the jury too much discretion.

20.  Simpson was denied the due process of law by the use of confusing jury instructions at the punishment phase of his trial.

21.  Simpson was denied a fair trial by the admission of unreliable expert testimony regarding his future dangerousness.

22.  Simpson was denied a fair trial by the admission of expert testimony regarding his future dangerousness by a witness who was not properly qualified to provide expert testimony.

23.  Simpson was denied the due process of law by the admission of unreliable expert testimony regarding his future dangerousness.

24.  Simpson was denied the due process of law by the use of jury instructions at the punishment phase of his trial that did not allow the jury to properly weigh mitigating evidence.

25.  Simpson's death sentence constitutes cruel and unusual punishment because the jury instructions at the punishment phase of his trial did not allow the jury to properly weigh mitigating evidence.

26.  Simpson was denied the due process of law by the use of jury instructions at the punishment phase of his trial that assigned the burden of proof on mitigation to him.

27.  Simpson's death sentence constitutes cruel and unusual punishment because the jury instructions at the punishment phase of his trial assigned the burden of proof on mitigation to him.

28.  Simpson was denied the due process of law by the use of jury instructions at the punishment phase of his trial that did not require the jury to consider mitigating circumstances by themselves in determining whether his life should be spared.

29.  Simpson's death sentence constitutes cruel and unusual punishment because the jury instructions at the punishment phase of his trial did not require the jury to consider mitigating circumstances by themselves in determining whether his life should be spared.

30.  Simpson's death sentence constitutes cruel and unusual punishment, and he was denied the due process of law, because, during the punishment phase of the trial, the trial court did not inform the jurors that although the instructions specified that 10 "no" votes as to either of the aggravating circumstances or 10 "yes" votes as to the mitigating circumstances were necessary in order for him to receive a life sentence, in reality, a single "no" vote as to either of the aggravating circumstances or a single "yes" vote as to the mitigating circumstances would have produced the same result.

31.  The trial court violated the Texas Constitution by not informing the jurors that although the instructions specified that 10 "no" votes as to either of the aggravating

circumstances or 10 "yes" votes as to the mitigating circumstances were necessary in order for him to receive a life sentence, in reality, a single "no" vote as to either of the aggravating circumstances or a single "yes" vote as to the mitigating circumstances would have produced the same result.

32.  Simpson was denied the due process of the law when the prosecution failed to disclose the favorable disposition of crimes committed by witnesses who testified against him.

33.  Simpson was denied the equal protection of the law when the prosecution failed to disclose the favorable disposition of crimes committed by witnesses who testified against him.

34.  Simpson was denied the right to confront witnesses when the prosecution failed to disclose the favorable disposition of crimes committed by witnesses who testified against him.

35.  Simpson's death sentence constitutes cruel and unusual punishment because the second special issue is not reviewable on appeal.

36.  The failure of the instructions to adequately explain the concept of mitigating evidence denied Simpson the equal protection of the law, the due process of law, and a fair trial, and rendered his death sentence cruel and unusual punishment.

37.  The failure of the jury instructions to adequately explain several of the terms used in the special issues denied Simpson the equal protection of the law, the due process of law, and a fair trial, and rendered his death sentence cruel and unusual punishment.

38.  Simpson's death sentence constitutes cruel and unusual punishment because the jury was not given the option of sentencing him to life without the possibility of parole.

### Standard of review

Title 28 U.S.C. § 2254(d) provides that relief may not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim resulted in a decision that was either:  (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2)

5

based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  A decision is contrary to clearly established federal law if the state court reaches a conclusion opposite to a decision reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  An application of clearly established federal law is unreasonable if the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 412-13.  Pure questions of law and mixed questions of law and fact are reviewed under Section 2254(d)(1), while pure questions of fact are reviewed under Section 2254(d)(2). *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001).

Factual findings made by the state court are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002).  Deference to the factual findings of a state court is not dependent upon the quality of the state court's evidentiary hearing. *See Valdez*, 274 F.3d at 951 (holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review.").[1]

---

[1]     In *Valdez*, the federal district court determined that the state court denied Valdez a full and fair hearing during the habeas proceedings because the state court lost exhibits admitted into evidence during the hearing and, as a result, did not consider those exhibits in resolving the case. *Valdez*, 274 F.3d at 944.  The district court was also concerned that the judge presiding over the state habeas proceedings admitted that he had never read the trial transcript and did not intend to read it because he did not "have the time." *Valdez*, 274 F.3d at 944-45.

The standards of review set forth in Section 2254(d) apply when the state court adjudicated the petitioner's claims on the merits.  28 U.S.C. § 2254(d).  A claim is adjudicated on the merits if the state court resolves the case on substantive grounds, rather than procedural grounds.  *Valdez*, 274 F.3d at 946-47.

Title 28 U.S.C. § 2254(b) generally prohibits granting relief on claims not previously presented to the state courts.  If a federal petition contains any such claims, the federal court will allow the applicant to return to state court and present them to the state court in a successive petition, either by dismissing the entire petition without prejudice, *Rose v. Lundy*, 455 U.S. 509, 520-22 (1982), or by staying the federal proceedings, *Rhines v. Weber*, 544 U.S. 269, 279 (2005).

If the federal court is convinced that the state court would refuse to consider the merits of a successive petition, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds.  *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  The federal court generally does not review procedurally defaulted claims unless the petitioner can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failure to address the claims would result in a fundamental miscarriage of justice.  *See Coleman v. Thompson,* 501 U.S. 722, 749-750 (1991); *Finley,* 243 F.3d at 220.  If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, the federal court will allow the state court the first opportunity to consider them.  *Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001).

**Analysis**

*I.  Use of Peremptory Challenges to Remove Minority Panelists From Jury (Issue 1)*

Simpson claims that he was denied the equal protection of the laws by the prosecution's use of a peremptory challenge to exclude Mr. John Willis Earl, an African-American, from the jury. This claim was adjudicated on the merits by the state court.  Therefore, Simpson is not entitled to relief unless the state court's determination was contrary to, or an unreasonable application of, clearly established federal law.

    *A.    Legal Standard*

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that the prosecution's use of a peremptory challenge against a potential juror solely because of his race violates the Equal Protection Clause.   The Court introduced a three-part test for evaluating claims of racial discrimination in jury selection.  *Batson*, 476 U.S. at 96-98.  First, the defendant must make a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Batson*, 476 U.S. at 96-97.  Second, if the showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the potential juror.  *Batson*, 476 U.S. at 97-98.  Unless a discriminatory intent is inherent in the prosecutor's explanation, it will be accepted as race-neutral. *Rice v. Collins*, _ U.S. _ , 126 S. Ct. 969, 973-74 (2006); *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005), *cert. denied*, __ U.S. __ , 126 S. Ct. 1028 (2006).  Finally, the trial court must decide whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98.  "A state trial court's finding of the absence of discriminatory intent is a 'pure issue of fact' that is accorded great deference and will not be overturned unless clearly erroneous."  *Murphy*, 416 F.3d at 432.

8

The Supreme Court recently considered the type and quantum of evidence required to demonstrate a *Batson* violation on federal habeas review of the state court's findings. *Miller-El v. Cockrell,* 545 U.S. 231, 125 S. Ct. 2317 (2005). In *Miller-El*, the Court found significant evidence of discriminatory intent. First, the prosecution peremptorily struck ten of the eleven qualified African-American venire members. *Miller-El*, 125 S. Ct. at 2339. The prosecution's reasons for striking some African-American venire members applied equally as well to some white jurors who were not struck. *Miller-El*, 125 S. Ct. at 2325-26. In addition, the trial court had no opportunity to judge the credibility of the prosecution's explanations for exercising the strikes because the *Batson* hearing was not conducted until two years after the trial. *Miller-El*, 125 S. Ct. at 2326 n.1. Next, the prosecution requested jury shuffles when a predominant number of African-Americans were seated in the front of the panel. *Miller-El*, 125 S. Ct. at 2332-33. The prosecution used disparate questioning for venire members of different races by prefacing its questions with a graphic description of the death penalty for fifty-three percent of African-American venire members versus six percent of white jurors. *Miller-El*, 125 S. Ct. at 2333-37. The prosecution also used trick questions. "Most potential jurors were first told that Texas law provided for a minimum term of five years, but some members of the panel were not, and if a panel member then insisted on a minimum above five years, the prosecutor would suppress his normal preference for tough jurors and claim cause to strike." *Miller-El*, 125 S. Ct. at 2337. Ninety-four percent of white venire members were informed of the minimum sentence, compared with twelve and a half percent of African-Americans. *Miller-El*, 125 S. Ct. at 2337. Finally, the evidence showed that the District Attorney's Office had a specific policy of excluding African-Americans from juries. *Miller-El*, 125 S. Ct. at 2440.

9

B.    *Application*

In this case, forty-nine venire members survived challenges for cause and the parties' agreed

excusals.  Of those forty-nine venire members, two were African-American, Mr. John Willis Earl

and Ms. Alison McLennan.    (Reporter's Record, Vol. 28 at 30.)    The prosecution exercised

peremptory challenges against both.  (RR, Vol. 28 at 14, 28-29.)  The defense objected, and the trial

court conducted a *Batson* hearing.[2]

As to Mr. Earl, the prosecutor articulated six reasons for exercising a peremptory challenge:

(1) Earl had a nephew who was an inmate in the Texas prison system; (2) Earl had been employed

by the Texas Department of Corrections in 1977-78; (3) during his employment at the prison, Earl

had worked with inmates who had been convicted of murder and he considered some of them to be

innocent; (4) Earl agreed with the proposition that African-Americans receive the death penalty

---

[2]    In this petition, Simpson does not challenge the prosecution's use of a peremptory strike against Ms. McLennan.
At the *Batson* hearing, Mr. Douglas E. Lowe, the District Attorney, explained the strike as follows:

> First of all, evaluating her questionnaire before I ever saw her--well, I developed a scoring system
> where I scored jurors 1 to 10.  Without ever having seen this person, I scored her as a 1, which is the absolute
> lowest score I could give a potential juror.  That was because of her views on the death penalty.  Also the fact
> that she was a single person.  She did have three children.  Also I scored her low on the fact that her aunt was
> on probation and that the father of one her [sic] children is Rodric Rhodes, Jr., who has been one of our chief
> troublemakers in Palestine and he now is in the Fed penitentiary.  His father is in jail in Anderson County now.
> And that was a huge negative.  That was just scoring her questionnaire.

> And then when I looked at her questionnaire regarding the death penalty issue, I felt that it was
> probably the strongest answer of any of the jurors on her opposition to the death penalty where she said, I don't
> feel that I have the power to determine if a person should die for any crime he or she commits.  And that answer
> to Number 3 was more likely than not, I believe, consistent with her strong opposition to the death penalty.
> Before I ever saw her I scored her low.

> Then when she testified it almost sounded like she was rehearsed when she . . . said, But I can follow
> the law and answer questions in order that the person would be executed.  She sounded very rehearsed to me,
> which frankly led me to believe that she had been perhaps coached.

> It seems implausible to me that she had a relationship with Henry Rhodes, Jr. for fifteen years and
> doesn't know anybody in Palestine, any of the people that are identified as his friends.  And also the fact that she
> works at the prison, she doesn't know anybody from Palestine.  It just seems real implausible and I felt like she
> was being untruthful when she responded to some of the Court's questions. . . .

> So those are the reasons we struck her, and no consideration regarding the venire person's race.

(RR, Vol. 28 at 37-39.)

"disproportionally more than other races or groups;" (5) Earl believed that a well-known inmate, Gary Graham, had been unjustly convicted and he had a strong belief that Governor Bush should have stayed Graham's execution; and (6) a juror consultant who reviewed Earl's questionnaire and responses suggested that he be struck.  (RR, Vol. 28 at 31-33); *Simpson*, 119 S.W.3d at 267.

The prosecution asked all prospective jurors whether they had any friends or family members with legal problems, and whether they felt those people had been treated fairly by the State of Texas. Eighteen venire members, including Earl, responded affirmatively.[3]  The State struck five,[4] or twenty-eight percent, of the venire members who indicated they had family or friends with legal problems.  In addition, the prosecution knew that three others were objectionable to the defense.[5] Because the defense tried to strike three venire members for cause, the prosecution could safely assume that the defense would exercise peremptory strikes against those venire members.[6]  The defense struck the three venire members.  Thus, eight of the eighteen venire members who had family or friends with legal problems, or forty-four percent, were eliminated.

---

[3]        The following non-African-American venire members reported having friends or family members who had legal difficulties: Ray Tart had a cousin in TDCJ (RR, Vol. 13 at 22); Steven McClain knew a lot of people either in prison or who had been in prison (RR, Vol. 14 at 153); Sharon Fleming's son was convicted of theft as a teenager (RR, Vol. 16 at 172); Brenda Martin's former brother-in-law had been in prison (RR, Vol. 16 at 228); Marilyn Riddoch's cousin and the boyfriend of her daughter had been in prison (RR, Vol. 18 at 44); Otho Keller's son-in-law was convicted of theft (RR, Vol. 19 at 26); Robert Stone had a friend in prison for murdering his wife (RR, Vol. 19 at 120); Jana Hale had a nephew in prison (RR, Vol. 20 at 30); Ann Altom's son had three convictions for driving while intoxicated (RR, Vol. 20 at 91); Robert Arthur's wife's nephew was in prison (RR, Vol. 21 at 29); Donna Fowler's sister-in-law was in prison for drugs (RR, Vol. 21 at 87); Newton Neely's stepson went to prison for forgery (RR, Vol. 22 at 33); Brenda Tarter's second cousin was in prison for child molestation (RR, Vol. 23 at 280); William Cheney had a friend serving a life sentence for murder (RR, Vol. 24 at 39); Glenda Steakley's stepson was in prison for child molestation (RR, Vol. 24 at 183); Gary Morris's brother-in-law went to prison for drunk driving (RR, Vol. 24 at 245); John Eason had a high school friend who was imprisoned for armed robbery (RR, Vol. 25 at 137).

[4]        The prosecution struck Martin (RR, Vol. 28 at 11), Riddoch (RR, Vol. 28 at 13), Earl (RR, Vol. 28 at 14), Hale (RR, Vol. 28 at 15), and Cheney (RR, Vol. 28 at 19).

[5]        The defense moved to dismiss Tart, McClain, and Steakley for cause.

[6]        During the *Batson* hearing, Mr. Mark Calhoon, an Assistant District Attorney, testified that the prosecution intended to exercise a peremptory strike against McClain, but, after gaining some insight into the defense's strikes, decided not to strike McClain because they knew that the defense would strike him.  (RR, Vol. 28 at 34-35.)

Nine venire members had worked in a prison, or had friends or relatives who had worked in prisons or with prisoners.[7]  Four venire members had worked in prisons themselves, while the rest had family members or friends who worked in prisons or with prisoners.  Of the four venire members who had worked in a prison the prosecution used peremptory strikes against three.[8]

Five venire members answered both questions affirmatively.  Ray Tart, Sharon Fleming, Brenda Martin, John Willis Earl, and Glenda Steakley had:  (1) worked at a prison, or had a family member or friend who worked at a prison or with prisoners; and (2) had friends or relatives in prison. The prosecution struck Earl and Martin.  The prosecution could also count on the defense removing Tart and Steakley since the defense had moved to strike those venire members for cause.  Thus, four of the five venire members who answered both questions affirmatively were struck.

The third reason offered by the prosecution for exercising a peremptory challenge against Earl was that during his employment in the prison system, Earl had worked with inmates who had been convicted of murder and Earl considered some of them to be innocent.  The colloquy on this subject was as follows:

> Q.  Okay.  Let me ask you this:  In your years at TDC or your year and a half, did you come to know any prisoners that might have been in there for murder?
>
> A.  At Ramsey?
>
> Q.  At Ramsey.

---

[7]     Frank Baker worked in vocational training programs for prisoners in several units (RR, Vol. 12 at 123-24); Ray Tart had a friend who worked in a prison (RR, Vol. 13 at 27); Regina Stroud's father was once a guard at a juvenile unit (RR, Vol. 14 at 231); Brian Woodson knew a prison guard years ago (RR , Vol. 15 at 167); Sharon Fleming's husband, a biologist with Parks and Wildlife, occasionally used inmate work crews (RR, Vol. 16 at 170); Brenda Martin was a chemical dependency counselor at a prison (RR, Vol. 16 at 224); John Willis Earl had worked in a prison (RR, Vol. 18 at 177-78); Terry Teems had two daughters who worked at a prison (RR, Vol. 18 at 230); Mary Parker's brother-in-law worked at a prison and her nephew formerly worked at a prison (RR, Vol. 22 at 265); Robyn McDowell was a clerk-typist in the prison system (RR, Vol. 23 at 129); and Glenda Steakley's daughter-in-law worked as a prison officer (RR, Vol. 24 at 185).

[8]     The prosecution peremptorily struck Martin (RR, Vol. 28 at 11), Earl (RR, Vol. 28 at 14), and McDowell (RR, Vol. 28 at 18).  The defense peremptorily struck Baker (RR, Vol. 28 at 9).

12

A.  Yes.

Q.  How many would you say?

A.  Five or six probably.

Q. Did you know them fairly well or just in passing?

A.  Just – well, we talked occasionally.

Q.  Okay.  Out of those five or six, do you have any reason to believe that any of those might be innocent?

A.  Well, I really hadn't thought about it like that.  But I don't know.  Maybe so, I don't know.

(18 RR 177-78.)

Simpson points out that the prosecution failed to ask other venire members with ties to the prison system, specifically, Sharon Fleming and Frank Baker, whether they believed that some prisoners incarcerated for murder were innocent.  Baker was a similarly situated venire member, having worked at the prison for ten years, but he did not ultimately serve on the jury because he was peremptorily struck by the defense.  Fleming did serve on the jury, but she had not worked at the prison herself; her husband occasionally worked with inmate crews in his position with Parks and Wildlife.  Thus, her ties to the prison system were tenuous, at best.

Finally, Simpson contends that the prosecution engaged in disparate questioning by asking Earl whether he agreed with the proposition that "African Americans receive the death penalty disproportionally more than other races or groups."  The prosecutor asked Earl a race-neutral question:  "Is there anything about the way the death penalty is applied in Texas that causes you concern?"  In response, the following colloquy took place:

A.  Well, on some appeals I feel like that maybe they should have looked at the case before they went on and--

13

Q. Okay. Do you know any cases in particular that you're interested in?

A. It was a case, I'm not sure exactly which one it was, but it was a-- it was a black guy. And they didn't grant him a stay. And I felt like he should have at least looked at the case, you know.

Q. Who are you talking about, "he," the governor?

A. Yeah, the governor.

Q. Would that have been Gary – were you familiar with the Gary Graham case?

A. I think that was the case.

Q. Was that the case? Okay.

A. And then--

Q. Have you read a lot about that particular case?

A. No, not really. Somewhat. I knew a lot about it, but I knew about it offhand.

(RR, Vol. 18 at 187-88.) In the course of the discussion concerning the Gary Graham case, the prosecution asked Earl whether he believed that, in the State of Texas, blacks are more likely to receive the death penalty than whites. (RR, Vol. 18 at 188.) Given the context, this was not disparate questioning, but a line of questioning built on Earl's responses to questions asked of every venire member.

C.     *Trial Court's Findings*

During voir dire, the defense objected to the prosecution's use of a peremptory strike against John Willis Earl. The defense contended that the prosecution improperly exercised a peremptory strike against Earl because he is African-American. (RR, Vol. 28 at 29-30.) After hearing the prosecution's explanations for striking Earl, the trial court found that the prosecution's explanations were clear, specific, supported by the record, and were race-neutral. (RR, Vol. 28 at 44-45);

*Simpson*, 119 S.W.3d at 267-68.  On direct appeal, the Texas Court of Criminal Appeals found: "None of the prosecutor's explanations reflect an inherently discriminatory intent.  And [Simpson] did not attempt to rebut the State's reasons.  The trial court's finding that the State's explanations were race-neutral is supported by the record and is not clearly erroneous." *Simpson*, 119 S.W.3d at 268.

> D.     Conclusion

Simpson has not presented clear and convincing evidence that the state court's factual findings were erroneous, or demonstrated that the state court's resolution of the *Batson* claim was contrary to, or an unreasonable application of, clearly established federal law.  In this case, unlike *Miller-El*, the *Batson* hearing was conducted at the time of trial.  There is no evidence that jury shuffles were used to move African-American venire members from the front of the panel, or of an historic pattern of the use of peremptory strikes in a discriminatory manner.  The comparisons between Earl and other venire members who were not peremptorily struck by the prosecution are insufficient to overcome the deference this Court must give to the state court findings.

## II.  Admission of Hearsay Statements Made by Non-testifying Co-defendant (Issues 2, 3 & 4)

Simpson claims that he was denied the right of confrontation when the trial court admitted hearsay statements made by a non-testifying co-defendant.  Simpson contends that the Texas Court of Criminal Appeals unreasonably applied federal law in finding that the violation of the Confrontation Clause was harmless error.  These claims were adjudicated on the merits by the state court.  Therefore, federal habeas relief is not available unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.  Simpson also contends that the violation had a substantial and injurious effect on the jury's verdict at the guilt/innocence and

15

punishment phases of trial.  This claim must be reviewed *de novo* because the state court was required to apply a different standard of review on direct appeal.

Simpson's wife, Jennifer, a co-defendant, did not testify at his trial.  However, the trial court admitted hearsay statements made by Jennifer to Christina Walker and Kenosha Walker.  During the guilt/innocence phase of the trial, Christina Walker testified that Jennifer told her that "Lionelle had tied the woman and [Simpson] had threw [sic] her in there . . . the river."  (RR, Vol. 32 at 118.) Kenosha Walker testified that Jennifer told her that "they went to the Neches River and that [Simpson] and Lionelle got the woman out of the trunk and Lionelle tied a rock to her ankles. . . ." (RR, Vol. 32 at 147.)

On direct appeal, the Texas Court of Criminal Appeals found that the statements were not admissible under state law.  The Court assumed that the admission of the statements also violated the Confrontation Clause, but did not explicitly rule on the issue because it found that any error in the admission of the statements did not contribute to Simpson's conviction.  *Simpson v. State*, 119 S.W.3d at 268-71.  Respondent does not argue that the hearsay statements were admissible under the Confrontation Clause.   Therefore, this Court will also assume that the admission of the statements violated the Confrontation Clause.

Admission of testimony in violation of the Confrontation Clause does not automatically warrant relief.  *See Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999) (remanding the case to the state court to determine whether the Confrontation Clause violation was harmless beyond a reasonable doubt); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  On direct appeal, if an appellate court finds a constitutional trial error, the lower court's judgment must be reversed unless the constitutional error is harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24 (1967);

16

*Robertson v. Cain*, 324 F.3d 297, 304 (5th Cir. 2003).  However, on collateral review, a federal court may grant relief based on constitutional trial error only if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Under this standard, the petitioner should prevail if the record is evenly balanced such that "a conscientious judge is in grave doubt as to the harmlessness of the error."  *O'Neal  v. McAninch*, 513 U.S. 432, 435 (1995); *Robertson*, 324 F.3d at 305.

In his third ground for review, Simpson argues that the state court's finding that the violation of the Confrontation Clause was harmless beyond a reasonable doubt was an objectively unreasonable application of *Chapman*.  In *Robertson v. Cain*, as in this case, the petitioner asserted that the *Brecht* harmless error analysis did not survive the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254.  *Robertson*, 324 F.3d at 299.  Robertson argued that the AEDPA's restrictive standards of review over state court decisions limited the federal habeas court to determining whether the state court's decision is contrary to, or an unreasonable application of, *Chapman*.  The Fifth Circuit rejected this argument and held that, "in cases governed by AEDPA, the federal habeas courts should continue to analyze the harmlessness of all state court decisions involving a constitutional 'trial' error according to the *Brecht* standard."  *Robertson*, 324 F.3d at 306-07; *see also Nixon v. Epps*, 405 F.3d 318, 330 n.13 (5th Cir.), *cert. denied*, __ U.S. __ , 126 S. Ct. 650 (2005).  Accordingly, even if this particular finding by the state court was objectively unreasonable, it would not provide a basis for habeas relief.

Simpson's fourth claim is that the admission of hearsay statements against him, in violation of the Confrontation Clause, had a substantial and injurious effect or influence on the jury's

determination of their verdict in both the guilt/innocence and the punishment phases of his trial.  *See Brecht*, 507 U.S. at 623.  Because the state courts were required to apply the *Chapman* standard on direct appeal, the Court must consider *de novo* whether Simpson has satisfied the harmless error standard set forth in *Brecht*.  *See generally Robertson v. Cain*, 324 F.3d 297, 306-07 (5th Cir. 2003).

During the guilt/innocence phase of the trial, Simpson's thirteen-year-old cousin, Edward McCoy, testified that he was with Simpson throughout the burglary, kidnaping, and killing. McCoy's testimony was similar to the hearsay statements made by Jennifer Simpson.  McCoy testified as follows:

> A.  Then Lionelle got the rope and tied the rope around her legs and [Simpson] got the other half of the rope and tied it around the brick and threw the brick in the water.
>
> Q.  Who threw the brick into the water?
>
> A.  [Simpson].
>
> Q.  Then what happened?
>
> A.  Then Lionelle got her hands and [Simpson] got her legs and started swinging her and chunked her in the river.

(RR, Vol. 33 at 111-12.)  McCoy's testimony was corroborated by other witnesses who saw Simpson driving an unfamiliar car (RR, Vol. 32 at 71-72), heard bumping noises coming from the car (RR, Vol. 32 at 75-77, 95-97), saw something that appeared to be a body in the trunk (RR, Vol. 31 at 210-11, 228-29, 242), and rented the victim's car from Simpson in exchange for drugs (RR, Vol. 31 at 176-77; RR, Vol. 32 at 10).  Also entered into evidence was a letter written by Simpson in which he claimed that Jennifer and McCoy murdered the victim, while Simpson stayed in the car with Lionelle.  (State's Exhibit 273.)

18

In light of the overwhelming evidence against Simpson, the Court finds that the hearsay statements erroneously admitted during the testimony of the Walker sisters did not have a substantial or injurious effect on the jury's determination during either the guilt/innocence or the punishment phases of the trial.  Because the violation of Simpson's rights under the Confrontation Clause was harmless, the Court will deny Simpson's fourth claim.[9]

## III.  Failure to Allow Defense to Rehabilitate Death-Scrupled Potential Juror (Issues 5, 6 & 7)

Simpson contends that the trial court erred by striking a potential juror, Ms. Brenda Looney, for cause without allowing defense counsel an opportunity to rehabilitate her.  Before Ms. Looney was brought into the courtroom, the court expressed doubt that she would be qualified to serve on the jury.  (RR, Vol. 14 at 196-97.)  Apparently reading from Ms. Looney's juror questionnaire, the trial judge observed that she had responded: "Says no because I can't put nobody to death.  And I could never under any circumstance return a verdict that assessed the death [sic].  Yes, I have moral beliefs that prevent from [sic] sitting in judgment.  Yes, I have moral, religious, personal beliefs that prevent me from returning a verdict of death."  (RR, Vol. 14 at 196.)  However, when initially questioned by the trial judge, Ms. Looney stated that she would be able to follow the law and render a verdict on the evidence even if it resulted in the death of another individual.  (RR, Vol. 14 at 206.)  The trial judge then asked more pointed questions, referencing her juror questionnaire.  The following exchange took place:

---

[9]        Simpson contends that McCoy's testimony was inadequate by itself to support a conviction under Texas state law, because he was an accomplice.  *See* TEX. CODE CRIM. PROC. Art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.").  Although Texas law requires corroboration of the testimony of an accomplice-witness, the United States Constitution does not impose a similar restriction on the use of accomplice-witness testimony.  *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991).  Therefore, a violation of the accomplice-witness rule would not warrant habeas relief.  *Ramirez v. Dretke*, 398 F.3d 691, 695 n.2 (5th Cir.), *cert. denied*, __ U.S. __ , 126 S. Ct. 51 (2005).

Q.  All right.  Have you got before you your questionnaire No. 23?

A.  Yeah.

Q.  Are the answers that you gave in that questionnaire true and correct?

A.  Yes, sir.

Q.  All right.  Turn to page 9.  You see down at the bottom there, the death penalty?

A.  Yeah, uh-huh.

Q.  I asked you, are you in favor of the death penalty, and you said no.

A.  No.

Q.  And then you said, because I can't put nobody to death.

A.  And I just said I could.

Q.  And you just said you could.  So what's the truth?

A.  Well, I don't--no, I just don't think I could.  Then again, I don't know, I would just have to wait, like you said, all the evidence come out.  It depends.

Q.  All right.

A.  If I would--if I felt like that it was, you know, really did do that, kill somebody or something.  I don't know.  I just--I ain't never really been confronted with it a lot.

. . . .

Q.  You said, I could never under any circumstances return a verdict which assessed the death penalty.

A.  Right.

Q.  Now, I've told you that--I've given you some circumstances that would assess a death penalty.

A.  Uh-huh.

Q.  And you said you could follow those instructions, but here you say you never could under any circumstances--

20

A.  Right.

. . . .

Q.  So what you're telling me, in looking at it in hindsight now, you think you would answer No. 4 then?

A.  More than likely, yes.

Q.  And you would say, I believe the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty, is that right?  Answer yes or no.

A.  Yes.

. . . .

Q.  All right.  Then what you're telling me is that, irrespective of what the facts are, you could never return a verdict of death penalty?

A.  Right.

. . . .

Q.  All right.  And then, I asked you . . . , do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which resulted in the execution of another human being, and you also said yes.

A.  Uh-huh.

Q.  Does that go back to your position that you could never return a verdict which assessed the death penalty?

A.  Yes, sir.

(RR, Vol. 14 at 206-11.)   The trial judge excused Ms. Looney.   Immediately afterwards, the prosecution challenged her for cause, and the judge granted the challenge.   The defense objected to the judge's ruling, arguing that the defense should have been allowed to question Ms. Looney.   The objection was overruled.  (RR, Vol. 14 at 211-12.)

21

On direct appeal, the Texas Court of Criminal Appeals found that Texas law is clear that the trial court, upon demand of either party, is required to permit that party to individually question a venire member on principles already discussed by the trial court. *Simpson*, 119 S.W.3d at 266 (citing TEX. CODE CRIM. PROC. art. 35.17, §2).   The Court noted that, in the past, it had applied different standards for reviewing violations of article 35.17.   *See Perillo v. State*, 656 S.W.2d 78, 81 (Tex. Crim. App. 1983) ("Excusing a prospective juror without giving counsel for the defendant an opportunity to question the juror should not ever occur, unless the record affirmatively and unequivocally reflects that the prospective juror would, regardless of the evidence, automatically vote for a verdict that would prohibit the assessment of the death penalty."), *modified*, *Howard v. State*, 941 S.W.2d 102, 113 (Tex. Crim. App. 1996) (holding that it is not error for the trial court to deny the defendant an opportunity to question a venire member before granting the prosecution's challenge for cause if it is clear that the venire member's view on the death penalty would prevent or substantially impair her ability to perform her duties).   However, in this case, the Texas Court of Criminal Appeals again modified the standard for determining error when the trial court denies defense counsel's request to individually question a venire member.   *Simpson*, 119 S.W.3d at 266. The Court held that, because the error was non-constitutional, it was appropriate to apply the harmless error standard set forth in Texas Rule of Appellate Procedure 44.2(b), which requires reversal only if the error had a substantial and injurious effect or influence in determining the jury's verdict.   *Simpson*, 119 S.W.3d at 266.   Applying that standard to this case, the Court concluded: "Given the venire member's testimony, it is highly unlikely that . . . the trial court would have abused its discretion in dismissing her for cause.   As a result, we have a fair assurance that the trial court's error did not influence the outcome of the trial."   *Simpson*, 119 S.W.3d at 267.

22

In his fifth ground for review, Simpson claims that the trial court's failure to allow defense counsel an opportunity to rehabilitate Ms. Looney constituted a structural constitutional error which required automatic reversal on appeal.  Alternatively, in his sixth ground for review, Simpson contends that the alleged error was of constitutional dimension, requiring reversal on direct appeal unless the constitutional error was harmless beyond a reasonable doubt.  *Chapman*, 386 U.S. at 24. Because these claims were adjudicated on the merits by the state court, Simpson is only entitled to relief if the state court's determinations were contrary to, or involved an unreasonable application of, clearly established federal law.

Simpson's fifth and sixth grounds for review lack merit because the defense's right to question prospective jurors was guaranteed by state law, not the United States Constitution.  Neither the Constitution nor federal law guarantees defense counsel the right to question prospective jurors. *See* FED. R. CRIM. P. 24(a) ("The court may examine prospective jurors or may permit the attorneys for the parties to do so."); *United States v. L'Hoste*, 609 F.2d 796, 802 (5th Cir. 1980) (holding that the trial court may deny counsel the privilege of addressing the venire).  Therefore, the state court's rejection of these claims was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

In his seventh ground for review, Simpson claims that the Texas Court of Criminal Appeals violated his right to due process by applying a non-constitutional harmless error standard to his claim that defense counsel was denied the state-conferred right to question a venire member.  This claim was not presented to the state courts, and Simpson has not provided the Court with any reason why the state court would allow him to raise this claim in a successive post-conviction petition, so the Court will treat the claim as if it were procedurally defaulted. *See Finley*, 243 F.3d at 220.  Simpson

does not contend that he had good cause for failing to raise this claim in his state post-conviction proceedings, and he does not contend that he is actually innocent.  Therefore, the doctrine of procedural default bars review of this claim.  *See Coleman,* 501 U.S. at 749-750.

In addition, the due process claim lacks merit.  A violation of state law during jury selection does not rise to the level of a due process violation unless the error rendered the entire trial fundamentally unfair.  *Fuller v. Johnson*, 158 F.3d 903, 908 (5th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 135 (1982)), *cert. denied*, 526 U.S. 1133 (1999).  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, _ , 126 S. Ct. 602, 604 (2005); *see also Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006) (holding that, on habeas review, a federal court cannot review the correctness of the state court's interpretation of state law).  Therefore, this Court is bound by the state court's determination of the appropriate harmless error standard under state law.

## IV.  Mental Retardation (Issues 8 & 9)

Simpson contends that he is ineligible for the death penalty because he is mentally retarded.  Because this is a question of fact, Simpson is entitled to relief only if the state court decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In *Atkins v. Virginia*, 536 U.S. 304, 317 (2002), the Supreme Court held that the execution of mentally retarded defendants violates the Eighth Amendment's prohibition of cruel and unusual punishment.  The Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution sentences."  *Id.*  The Supreme Court referred to the

clinical definitions for mental retardation promulgated by the American Association on Mental

Retardation ("AAMR") and the American Psychiatric Association ("APA"), but declined to articulate

a legal standard for assessing claims of mental retardation.  *Clark v. Quarterman*, 457 F.3d 441, 445

(5th Cir. 2006), *cert. denied*, __ U.S. __ , __ S. Ct. __ , 2007 WL 559944 (Feb. 26, 2007).

Simpson's trial took place before *Atkins*, so the issue of mental retardation was not

determinative at the punishment phase of the capital murder trial.  However, the issue was litigated

during the punishment phase as potentially mitigating evidence.  The Texas Court of Criminal

Appeals summarized the evidence of mental retardation introduced in the punishment phase as

follows:

> During the punishment phase of applicant's trial, the defense called applicant's
> father, mother, and two sisters.  Significantly, none of these witnesses--the persons
> who knew him best during his youth--testified that they had thought, during his
> formative years, that applicant was mentally retarded.  [FN9: LaTonya, one of
> applicant's sisters, did testify that applicant was twice held back in elementary school
> and "had a bunch of problems."  She testified that he missed a lot of school: "I'm not
> saying he was retarded, but I'm just saying that he was slow."  Applicant's other
> sister, Tangela, testified that applicant was slow "as far as educational level," but not
> in other things.]  Applicant's father remembered that applicant had twice suffered
> head injuries as a child, but he did not know whether he suffered any brain injury as
> a result.  He testified that applicant had had school truancy problems and usually got
> into trouble alone.  While applicant's father stated that applicant had a history of
> seizures, his sister said that she did not believe that applicant had ever suffered
> seizures.  Applicant's elder sister, a TDCJ-CID prison guard, said that there was very
> little good that she could say about him other than the fact that he attended church.
> Applicant's mother testified that applicant failed kindergarten and third grade, that
> he was sometimes placed in special-education classes, and that he was "very slow
> and had a learning disability."  He missed a lot of school because he had headaches,
> felt bad about himself, and because she could not drive him to school all the time, as
> she had to work two jobs.  She made him move out of her home about a year before
> the murder because he had sexually assaulted her adopted daughter.
>
> The defense also called a psychologist, a pediatric neurologist, and a
> psychiatrist to testify to applicant's mental condition and abilities.  Dr. Andrews, the
> psychologist, testified that applicant has borderline intellectual functioning.  He
> stated that applicant's academic knowledge is "low" and that he reads at an early

high-school level, and has a fifth-grade spelling ability and sixth-grade math ability. When applicant was 14 years old, his full-scale IQ score on the Wechsler Intelligence Scale for Children was 71, and he scored a 72 on the TONI.  [FN10: Test of Non-Verbal Intelligence.]  The next year he received a 78 full-scale IQ score on the Wechsler and an 86 on the TONI-2.  No one discussed the significance of this improvement in IQ scores.

Applicant dropped out of school in the ninth grade.  His teachers consistently noted his high truancy rate as an educational impediment.  Dr. Andrews stated that applicant has adaptive deficits and a low ability to complete planning and organization tests.  He did not believe that applicant was faking mental deficiencies, but he did think that applicant is "a chronic liar" and that his manipulative conduct in jail demonstrated adaptive behavior. [FN11: Dr. Andrews agreed that applicant's conduct in writing his mother-in-law from jail saying that he would serve his time for this capital murder in a mental hospital by telling "my lawyer and the judge that I need some help and I'm having problems and seeing things and hearing things" was goal-directed and showed a knowledge of the legal system and how to avoid the death penalty.  Dr. Andrews stated that he did not believe applicant when applicant told him he had auditory and visual hallucinations.  Applicant also told Dr. Andrews that he had been hospitalized for psychiatric problems, but Dr. Andrews could not find corroboration for this assertion.]  Dr. Andrews concluded that applicant is in the "borderline mentally retarded range" and would not resolve complex situations very well.  [FN12: Concerning the issue of "significant adaptive deficits," Dr. Andrews explained:  "Well, he was not able to function well in school.  He was not able to function well in a work setting.  These could be adaptive deficits.  They might be problems with personality as well.  I am not terming him mentally retarded but I do think he has some adaptive deficits."  He noted that applicant had been diagnosed with a learning disability, not mental retardation, by school officials based upon his IQ test of 78 and TONI results of 86.]  Dr. Andrews also stated that applicant has an anti-social personality.

Dr. Wise, a pediatric neurologist, reviewed applicant's EEG (electroencephalogram) and testified that applicant has an abnormal neurological status, a generalized slowing of brain function.  He stated that the brain changes as a person ages and is influenced by such things as diet, smoking, drug use, and trauma.  He had not personally examined applicant.

Dr. Barry Mills, the chief psychiatrist for the Maximum Security Behavior Management Program at Vernon State Hospital, examined applicant and concluded that applicant has two subdural hematomas (blood clots on both sides of his brain) which have caused brain damage.  As a result, applicant has poor judgment, an inability to learn from his mistakes or to change his actions in response to complicated situations, and an inability to control frustration or manage himself.  Dr. Mills acknowledged that there is nothing in applicant's medical records to confirm

any head injury.  He did agree that smoking embalming fluid may cause EEG changes.  Dr. Mills stated that applicant was not malingering during his examination but that he had been "manipulative and dishonest throughout a large part of his life."  He testified that "I did not say [applicant] was mentally retarded.  I said he was borderline mentally retarded, essentially functioning at that level, but his I.Q. score was not mentally retarded."  He agreed that applicant had never been diagnosed by anyone as "borderline mentally retarded" until after he was charged with capital murder, and he stated that applicant's TONI IQ of 86 was "a more accurate measure of [applicant's] intelligence."

In rebuttal, the State called Dr. David Self, a psychiatrist, who had also examined applicant.  In his opinion, applicant was malingering and faking his psychiatric symptoms.  He stated that, during his interview, applicant spontaneously launched into a narrative of various mental complaints, including visual and auditory hallucinations, depression, an attempted suicide, and a history of head trauma.  In Dr. Self's opinion, applicant's intellectual functioning is in the borderline-to-low average range and he does not have significant adaptive deficits.  Dr. Self described applicant's letter-writing campaign from jail to various friends and relatives asking them to smuggle contraband to him as adaptive, albeit anti-social, behavior.  In his opinion applicant's lack of empathy, his callous disregard for others, and his prior conduct, including his sexual assault of his adopted sister, his shooting at his ex-girlfriend, and his assaults on his wife and children, were traits consistent with a psychopathy [sic].  Dr. Self stated that applicant's MRI showed evidence of a prior "head trauma," but no evidence of any brain damage.  He concluded that applicant has an anti-social personality disorder, but is not mentally retarded.

*Simpson*, 136 S.W.3d at 664-65.

Petitioner filed his state application for writ of habeas corpus on December 3, 2002.  By this time the trial court and the parties had the benefit of the *Atkins* analysis.  During the state habeas proceedings, additional evidence was submitted for the trial court's consideration.  Simpson filed two volumes of documents, including affidavits, treatise excerpts, documents from the trial, and published articles.  *Simpson*, 136 S.W.3d at 662.  The evidence also included Simpson's school records, two written statements he gave to the police after his arrest, inmate request forms that he submitted while he was in jail, letters to family and friends from jail, a letter to a venire member whose name and address he had memorized in the courtroom from his attorney's jury list, and

Simpson's medical and mental-health records from TDCJ-CID.  *Simpson*, 136 S.W.3d at 665-66.

The Texas Court of Criminal Appeals summarized these additional exhibits as follows:

> Applicant's school records showed that, in almost every year, he missed a large number of school days, but nonetheless he achieved passing grades in almost all classes.  Seventeen "Notices of Concern" were sent to his family during one school year; they noted that applicant failed to complete assignments, failed to make up missed tests, and that he exhibited "excessive absences" and "lack of effort."
>
> Applicant's jail letters are clear, coherent, and clever.  In one, he explains to his cousin how to smuggle photographs of his three girlfriends into the jail by taping them to extra pages in an incoming letter.  In letters to his brother, applicant writes jocularly in gang slang.  In letters to his mother, on the other hand, applicant writes in standard English, without slang.  He uses a polite tone as he instructs her on how to smuggle tobacco and rolling papers into the jail by putting them in envelopes labeled "Legal Mail," and having them delivered by his defense investigator.  He tells his mother that he is working on getting joint custody of his son for her and his wife's mother, and asks her to call the defense investigator and have him bring applicant a small tape recorder so he can record his wife's custody concessions on the phone.
>
> Applicant's TDCJ-CID medical and mental-health records show that applicant achieved an IQ result of 84 on a TONI test when he arrived on death row which, according to the records, "precluded other need for I.Q. testing."

*Simpson*, 136 S.W.3d at 666.

On June 23, 2003, after finding that there were no factual issues that required an evidentiary hearing, the trial judge ordered the parties to file proposed findings of fact and conclusions of law. *Simpson*, 136 S.W.3d at 662.  On July 14, 2003, Simpson filed an additional affidavit by Dr. Windel Dickerson who concluded that Simpson was mildly mentally retarded.  *Simpson*, 136 S.W.3d at 662. Two weeks later, the trial judge signed an order permitting the parties to file additional educational records for Simpson.  *Simpson*, 136 S.W.3d at 662.  However, on the same day, the trial judge signed the State's proposed findings.  *Simpson*, 136 S.W.3d at 662.

The trial judge found that Dr. Dickerson's affidavit should not be considered because it was untimely, but, in the alternative, found that it was unpersuasive.  *Simpson*, 136 S.W.3d at 666.  The

28

trial judge found that: (1) the prison testing conditions likely affected the test scores; (2) the IQ score of 59 that Dr. Dickerson reached was at odds with the prior test scores; (3) Dr. Dickerson did not test for malingering; (4) Dr. Dickerson's assertion that Simpson was treated as a mentally retarded child in school was contrary to all other evidence which showed that Simpson had a learning disability and a truancy problem; (5) it did not appear that Dr. Dickerson had reviewed the trial record; (6) the "adaptive behavior" assessment did not describe behavior that is necessarily the result of mental retardation; and (7) Dr. Dickerson relied extensively on Simpson's self-reporting, but Simpson's veracity had been called into question by other experts. *Simpson*, 136 S.W.3d at 666 n.13.

When the trial court made its findings, the Texas Court of Criminal Appeals had not yet determined what legal standard applied to claims of mental retardation. Applying the AAMR standard, the trial court concluded that Simpson was not mentally retarded. (State App. at 626--61.)

On August 7, 2003, Simpson submitted his special education records and a videotaped statement made by Dr. Dickerson that was substantively the same as his earlier affidavit. *Simpson*, 136 S.W.3d at 662, 666 n.13. These records were forwarded to the Texas Court of Criminal Appeals with the other habeas materials on September 10, 2003. *Simpson*, 136 S.W.3d at 662-63.

On February 11, 2004, in the absence of legislation to carry out the *Atkins* mandate, the Texas Court of Criminal Appeals adopted two definitions of mental retardation which both contain the same substantive elements. *Ex parte Briseno*, 135 S.W.3d 1, 4-8 (Tex. Crim. App. 2004). The first is the AAMR definition, which the Supreme Court cited with approval, and which the trial court applied on habeas review of Simpson's mental retardation claim. The AAMR defines mental retardation as a disability characterized by: (1) significantly subaverage general intellectual functioning, generally defined as an IQ below seventy; (2) accompanied by related limitations in

29

adaptive functioning; and (3) onset before the age of eighteen.  *Briseno*, 135 S.W.3d  at 7.  The second definition, from the Texas Health and Safety Code, requires "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."  *Briseno*, 135 S.W.3d at 7.  To assess whether the defendant has limited adaptive functioning, the Texas Court of Criminal Appeals allows the fact-finder to consider whether:  (1) the people who knew the defendant during the developmental stage thought he was mentally retarded at the time; (2) the defendant formulated plans and carried them through, or acted impulsively; (3) the defendant's conduct showed that he is a leader or a follower; (4) the defendant's conduct in response to external stimuli is rational, regardless of whether it is socially acceptable; (5) the defendant responds coherently and rationally on point to questions; (6) the defendant can hide facts or lie to further his own interests; and (7) whether the commission of the crime required forethought, planning, and complex execution.  *Briseno*, 135 S.W.3d at 8-9.

On state habeas review of this case, the Texas Court of Criminal Appeals noted that, although the trial court did not have the benefit of the *Briseno* opinion, it followed the methodology and legal standards set forth in that opinion.  After considering the evidence,[10] the Texas Court of Criminal Appeals concluded that: "[A]lthough there was some evidence in the trial and writ record suggesting the possibility of mild mental retardation, there was also ample evidence in the record supporting the trial court's finding that applicant is not mentally retarded.  We conclude that the trial court did not abuse its discretion in reaching this factual conclusion."  *Simpson*, 136 S.W.3d at 667.

---

[10]      The Texas Court of Criminal Appeals independently reviewed the special education records and Dr. Dickerson's videotaped statement, which were submitted to the trial judge after he entered his findings.  *Simpson*, 136 S.W.3d at 662-63 n.4.  The Court did not consider additional evidence later submitted directly to the Texas Court of Criminal Appeals.  *Id*. at 667-69.  The evidence consisted of Dr. Dickerson's report concerning a second mental status test.  *Id*. at 668.  Dr. Dickerson again claims he found, under better testing conditions, that Simpson is mildly retarded and suffers from organic brain damage.  *Id.*

The question of whether Simpson meets the criteria for mental retardation is a question of fact. *Clark*, 457 F.3d at 444.  Therefore, Simpson is entitled to relief only if he shows that the state court decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *Clark*, 457 F.3d at 444.  Simpson has the burden of rebutting the state court's factual findings with clear and convincing evidence.  *Clark*, 457 F.3d at 444.  Simpson has not met this burden.  A review of all the evidence available to the state courts and this Court[11] shows that Simpson has borderline intellectual functioning.  However, the experts disagree as to the extent of his intellectual functioning, with some experts finding that he is mentally retarded and some finding that he is not.  Although there is evidence from which a fact-finder could conclude that Simpson is mentally retarded, that conclusion is not compelled by the evidence.  He achieved passing grades in most classes in school in spite of missing a large number of days.  He is able to adjust the vocabulary and tone of his letters depending on whether he is writing to his brother or mother.  He was able to instruct his cousin and mother on ingenious ways to smuggle contraband into the prison.  It was not unreasonable for the state court to conclude that Simpson is not mentally retarded, and Simpson has not rebutted this finding by clear and convincing evidence.

Simpson contends that the Eighth Amendment prohibits his execution if the Court finds that he has borderline intellectual functioning or brain damage, but not mental retardation.  This claim lacks merit because the holding in *Atkins* does not extend to defendants with brain damage or borderline intellectual functioning.

In his ninth ground for review, Simpson contends that the state court's failure to require that a jury determine beyond a reasonable doubt that he was not mentally retarded denied him the due

---

[11]        Simpson submitted additional evidence to the Texas Court of Criminal Appeals and with this habeas petition.  The Court finds that this evidence meets the exhaustion requirements because it supplements, but does not fundamentally alter, the claim presented to the state courts.  *Moore v. Quarterman*, 454 F.3d 484, 491 (5th Cir. 2006).

process of law.  The state court adjudicated this claim on the merits, so Simpson is not entitled to relief unless the state court's determination was contrary to, or an unreasonable application of, clearly established federal law.

In *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000), the Supreme Court of the United States held that facts which increase the punishment for an offense beyond the statutory maximum must be determined by a jury and must be proven beyond a reasonable doubt.  In  *Ring  v. Arizona,* 536 U.S. 584, 609 (2002), the Court held that aggravating factors in capital punishment statutes were subject to the requirements of *Apprendi*.  Simpson argues that since mental retardation is a mitigating factor, the absence of mental retardation is an aggravating factor which is subject to the requirements set forth in *Ring* and *Apprendi*.  The Fifth Circuit has rejected this circular argument, stating that the Supreme Court of the United States has neither directly, nor by implication, required the absence of mental retardation to be found by a jury beyond a reasonable doubt.  *United States v. Webster,* 421 F.3d 308, 312 (5th Cir. 2005), *cert. denied,* _ U.S. _ , 127 S. Ct. 45 (2006); *In re Johnson*, 334 F.3d 403, 405 (5th Cir.2003).   Because this Court is bound by that precedent, it finds that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

*V.  Jury Issue on Future Dangerousness Violated* <u>*Ring*</u> *and* <u>*Apprendi*</u> *(Issue 10)*

Article 37.071 § 2(b) of the Texas Code of Criminal Procedure provides that the following special issue be submitted to the jury at the conclusion of the sentencing phase:  "[W]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. . . ."  The statute provides that the jury may not answer "yes" unless it unanimously agrees that the prosecution proved the issue beyond a reasonable doubt.  TEX. CODE CRIM. PRO. Art. 37.071 § 2(c), (d)(2).  Citing *Apprendi* and *Ring*, Simpson argues that the statute

is unconstitutional because the jury is asked to find beyond a reasonable doubt whether the defendant would probably be dangerous in the future, instead of finding beyond a reasonable doubt whether the defendant would be dangerous in the future.[12]  Simpson contends that injecting the word "probability" into the special issue lowers the prosecution's burden of proof.

On habeas review, the state trial court found that this claim was procedurally barred because it was not raised at trial or on direct appeal.  (State App. at 664.)  In the alternative, the court found that the claim lacked merit. (State App. at 665-66.)

Federal habeas review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously denied relief based on a state procedural default.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Brewer v. Quarterman*, 466 F.3d 344, 346-47 (5th Cir. 2006); *Meanes v. Johnson*, 138 F.3d 1007, 1010 (5th Cir. 1998).  Because the last state court to consider the issue found that petitioner had defaulted the claim, Simpson is procedurally barred from challenging the future dangerousness instruction in a federal habeas proceeding.

Where a state prisoner has defaulted his federal claims in state court by failing to follow applicable state procedural rules, the claims may not be reviewed in federal court unless the prisoner demonstrates cause for the default and actual prejudice as a result of the alleged error.  *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992).  A prisoner who fails to establish cause for the procedural default may still be entitled to habeas relief if he shows that imposition of the procedural bar would constitute a miscarriage of justice.  *Coleman*, 501 U.S. at 750.  Simpson has not met this burden because he did not address the procedural default.  Simpson failed to show cause for the default or demonstrate that he was prejudiced by the alleged error.  Nor does Simpson allege that imposition

---

[12]       Simpson argues that, in order for the special issue to be constitutional, it should use language such as the following:  "We, the Jury, find that the defendant, beyond all reasonable doubt, will commit future acts of violence that constitute a grave and continuing threat to society, to include loss of life and serious bodily injury."  (Petition at 123.)

33

of the procedural bar would result in a miscarriage of justice.  Therefore, the claim is not reviewable

in this proceeding.

In addition, Simpson is not entitled to relief because the claim lacks merit.  The Fifth Circuit

addressed, and rejected, this claim in *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir.), *cert. denied*,

_ U.S. _ , 126 S. Ct. 103 (2005).  The Court held:

> Texas's use of special issue no. 1 in the punishment phase of Rowell's capital case,
> which required the jury to answer "yes" only if the State had proven "beyond a
> reasonable doubt that there is a probability that [Rowell] would commit criminal acts
> of violence that would constitute a continuing threat to society," does not violate
> *Blakely*, *Apprendi*, or *Ring*.  Accepting Rowell's argument that special issue no. 1 is
> unconstitutional because the term "probability" swallows the reasonable doubt
> standard under an extension of *Apprendi* and *Ring* by *Blakely* would be a violation
> of *Teague*.[13]

*Rowell*, 398 F.3d at 379.  Because this Court is bound by the Fifth Circuit's opinion in *Rowell*, it will

deny Simpson's tenth claim.

## VI.  Mitigation Burden of Proof Violated *Apprendi* (Issue 11)

Simpson contends that the absence of mitigation is the functional equivalent of an

aggravating factor, subject to the rule of *Apprendi* and *Ring*.  Thus, Simpson argues that the

prosecution must prove beyond a reasonable doubt that there are no mitigating factors warranting

the imposition of a life sentence rather than a death sentence.

During the state habeas proceedings, the state trial court found that this claim was

procedurally barred because Simpson had not raised it at trial or on direct appeal.  (State App. at 666-

67.)  Simpson has not shown cause for the default, or prejudice from the alleged error.  Simpson also

failed to demonstrate that imposition of the procedural bar would result in a complete miscarriage

of justice.  Therefore, the claim is procedurally barred.

---

[13]     In *Teague v. Lane,* 489 U.S. 288, 316 (1989), the Supreme Court held that federal courts could not apply new
rules of constitutional law in habeas corpus cases.

34

In the alternative, Simpson is not entitled to relief on the merits of the claim.  Pursuant to the state law in effect at the time, the following special issue on mitigation was submitted to the jury during the punishment phase of the trial:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PRO. Art. 37.071 § 2(e)(1) (Vernon Supp. 2002).  In *Rowell*, the Fifth Circuit found that there was no Supreme Court or Fifth Circuit authority requiring that the Texas mitigation issue be proved beyond a reasonable doubt.  *Rowell*, 398 F.3d at 378.  The Fifth Circuit concluded that accepting such an argument would create a new rule of constitutional law in violation of *Teague*. *Rowell*, 398 F.3d at 379.  In light of the Fifth Circuit's holding in *Rowell*, this claim lacks merit.

Simpson also contends that the special issues that the jury was asked to answer in the punishment phase of the trial are "aggravating factors" that the jury is required to find before a defendant can be sentenced to death.  Simpson asserts that he was denied due process by the prosecution's failure to plead the special issues in the indictment.

When this claim was raised in the state habeas proceedings, the trial court found that it was procedurally barred because Simpson did not raise it at trial or on direct appeal.  (State App. at 664.) In the alternative, the trial court found that Simpson was on notice that the special issues would be submitted in accordance with Texas Code of Criminal Procedure article 37.071 and, therefore, the omission of the special issues from the indictment did not deprive Simpson of his right to notice of the charges against him.  (State App. at 665.)

Because the last state court to consider the issue found that petitioner had defaulted the claim, Simpson is procedurally barred from challenging the indictment in a federal habeas

35

proceeding unless he shows cause for the default and actual prejudice as a result of the alleged error, or that imposition of the procedural bar would constitute a miscarriage of justice. Simpson has not met this burden because he did not address the procedural default. Simpson failed to show cause for the default or demonstrate that he was prejudiced by the alleged error. Nor does Simpson allege that imposition of the procedural bar would result in a miscarriage of justice. Therefore, the claim is not reviewable in this proceeding.

In the alternative, Simpson is not entitled to relief on the merits. Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment. *See Apprendi*, 530 U.S. at 477 n.3 (declining to address the indictment issue because it was not raised by the petitioner); *Ring*, 536 U.S. at 597 n.4 (noting that petitioner did not contend that his indictment was constitutionally defective); *see also United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) (noting that the Supreme Court has yet to hold that aggravating factors must be charged in the indictment). Accordingly, the Court finds that the state court's alternative ruling on the merits was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See Martinez v. Dretke*, 2005 WL 1383350 (N.D. Tex June 8, 2005) (finding that the state court's decision that the indictment was not fundamentally defective for failing to allege future dangerousness was not contrary to, nor did it involve an unreasonable application of, clearly established federal law), *certificate of appealability denied*, 173 Fed.Appx. 347 (5th Cir.), *cert. denied,* __ U.S. __ , 127 S. Ct. 434 (2006).

*VII.  Unreliable Expert Witness Testimony (Issues 12, 13 & 14)*

Royce Smithey, an investigator with the Special Prison Prosecutions Unit, testified for the prosecution during the punishment phase. Mr. Smithey testified generally about violence within the Texas prison system and the system for classifying inmates, but expressed no opinion about whether

Simpson would pose a future danger. Simpson contends that the scientific basis of Smithey's opinions was unreliable and that his testimony should have been ruled inadmissible based on *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Simpson claims that the admission of this allegedly unreliable and inaccurate expert testimony about prison violence violated his rights to due process, to equal protection, and to be free from cruel and unusual punishment.

On state habeas review, the trial court found that Simpson had procedurally defaulted the constitutional issues with respect to the admission of Smithey's testimony because he did not object on those grounds at trial, or raise the issues on direct appeal. (State App. at 676.) In the alternative, the trial court found that the claims lacked merit. The court found that Smithey was qualified to testify to lay opinions which he had derived from his own observations, and to offer expert opinions. (State App. at 677.) The trial court found that Smithey's testimony consisted primarily of factual testimony about prison procedures and prison violence based on his experience in investigating violent offenses in the prisons. (State App. at 677.) The trial court found that the remainder of Smithey's testimony concerned factual figures on prison population, numbers of prison assaults, and his opinion that the prison system is unable to completely isolate offenders from guards and staff. (State App. at 678.) The trial court noted that defense counsel used the same statistics to demonstrate the infrequency of homicidal attacks in the prison system. (State App. at 678.) Finally, the trial court found that Simpson waived any objections to Smithey's testimony by failing to object when Simpson's sister, a prison guard, testified as to violence in the prisons. (State App. at 678-79.)

Simpson is procedurally barred from challenging Smithey's testimony on federal habeas review because the last state court to consider the issue found that petitioner had defaulted the claim. Simpson has not attempted to show cause for the default, or that he was prejudiced by the alleged error. Nor does Simpson allege that imposition of the procedural bar would result in a miscarriage

of justice.  Therefore, the claims are not reviewable in this proceeding.  *Coleman*, 501 U.S. at 729.

In the alternative, the claims lack merit.  Simpson is entitled to relief only if the state court's

alternative ruling on the merits was contrary to, or an unreasonable application of, clearly established

federal law.

    *Daubert v. Merrill Dow Pharmaceuticals, Inc.* did not set a constitutional standard for the

admissibility of expert testimony.  *Milone v. Camp,* 22 F.3d 693, 702 (7th Cir. 1994), *cert. denied,*

513 U.S. 1076 (1995).  It simply examined the standard for the admissibility of scientific evidence

under the Federal Rules of Evidence.  Thus, a violation of *Daubert* does not equal a constitutional

violation.

    Federal courts do not review the admissibility of evidence under state law.  *Little v. Johnson*,

162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999).  An erroneous state court

evidentiary ruling does not warrant federal habeas relief unless the ruling violated a specific federal

constitutional right or was so egregious that it rendered the trial fundamentally unfair.  *Kittelson v.

Dretke*, 426 F.3d 306, 320 (5th Cir. 2005).  The wrongful admission of evidence renders a trial

fundamentally unfair only if the evidence played a "crucial, critical, and highly significant role in the

trial. . . ."  *Little*, 162 F.3d at 862.

    In the present case, the thrust of Smithey's testimony was that the Texas Department of

Criminal Justice is not able to stop an inmate from committing acts of criminal violence if the inmate

is determined to commit them.  Simpson argues that it was fundamentally unfair to allow Smithey

to testify about prison violence because he was unqualified, had previously admitted that he was

unqualified,[14] and the State knew that he was not qualified to testify as an expert.  However,

---

[14]    Simpson cites Smithey's testimony in *State v. Rowton* in support of his contention that Smithey acknowledged he was unqualified to testify as an expert.  (Rowton Transcript, Attachment 22 to Petition.)  However, Simpson has mischaracterized

(continued...)

assuming Smithey's testimony was wrongfully admitted, Simpson has not shown that Smithey's testimony played a "crucial, critical, and highly significant role" in the punishment phase.  As the trial court pointed out, the substance of Smithey's testimony was also addressed by other witnesses in the punishment phase.

The Court finds that the state court's rejection of the claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  Therefore, Smithey's twelfth ground for review will be denied.

In his thirteenth ground for review, Simpson contends that the admission of Smithey's testimony denied him the equal protection of the laws.  Simpson contends that the admission of Smithey's testimony was improper for three reasons:  it was not reliable, it was misleading and inaccurate, and it was not individualized as to him.  However, Simpson never explains how these alleged improprieties constitute a violation of the equal protection clause, and the Court has found no authority for the proposition that the admission of unreliable expert testimony implicates that constitutional provision.  The Court finds that the state court's denial of Simpson's thirteenth claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, so it will deny this claim.

---

[14](...continued)
Smithey's testimony in that case.

Smithey summarized his credentials during a voir dire examination.  In response to defense counsel's question as to his expertise, Smithey stated that he is an expert on prison violence as the chief investigator for the Special Prison Prosecution Unit which investigates and prosecutes violent crimes that occur inside the prison system.  (Rowton Transcript at 97.)  Smithey testified that he had worked closely with classification for fifteen years and was familiar with the general classification process.  (Rowton Transcript at 101.)  Smithey testified that he had not examined the defendant's records, and could not say how he would be classified, but he had some expertise in classification and could explain the general process.  (Rowton Transcript at 102-03.)  Then, when defense counsel asked whether Smithey was an expert on classification, Smithey responded, "No, sir."  (Rowan Transcript at 103.)  In response to the prosecutor's questions, Smithey more fully described his knowledge about classification and violence within the prison system.  (Rowan Transcript at 106-120.)  At the conclusion of the voir dire examination, the trial court overruled defense counsel's objection to the testimony of Smithey and allowed Smithey to testify.  (Rowan Transcript at 125-26.)

Simpson's fourteenth claim is that the admission of Smithey's testimony rendered his death sentence cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments.

The failure to take into account the individual actions and character of the defendant in deciding whether to impose the death penalty violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Sumner v. Schuman*, 483 U.S. 66, 85 (1987).  Simpson points out that Smithey's testimony was not related to Simpson as an individual.  As explained above, the thrust of Smithey's testimony was that the prison system could not entirely prevent prisoners from committing acts of violence.  The jury was still required to determine, based upon Simpson's character and history, whether he would be dangerous in a prison environment.  Because the sentencing special issue itself required an individual assessment of Simpson, the introduction of evidence about his future environment did not violate his Eighth Amendment rights.  *See Barefoot v. Estelle*, 463 U.S. 880, 903-04 (1983) (holding that expert testimony on future dangerousness is admissible, regardless of whether it is based on an examination of the defendant or hypothetical questions); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) ("We also disagree that Johnson could have persuasively argued to the district court that *Daubert*. . .altered the admissibility of [expert future dangerousness testimony] after *Barefoot*."), *cert. denied*, 538 U.S. 926 (2003); *Tigner v. Cockrell*, 264 F.3d 521, 527 (5th Cir. 2001) ("We decline Tigner's invitations to undercut *Barefoot*, because to do so on collateral review would constitute a new rule in violation of *Teague*'s non-retroactivity principle."), *cert. denied*, 534 U.S. 1164 (2002).  The Court finds that the state court's denial of Simpson's fourteenth claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

*VIII.  Failure to Disclose Exculpatory Evidence (Issue 15)*

Simpson contends that he was denied due process when the prosecution failed to disclose statistical reports, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995).  During his testimony in the punishment phase, prosecution witness Royce Smithey referred to statistics kept by the Texas Department of Criminal Justice's Emergency Action Center ("EAC").  Although Smithey produced copies of the records to the defense during its *voir dire* of his qualifications to testify, Simpson argues that, had the prosecution disclosed the records earlier, the defense could have employed an expert witness to review them and used the information contained within the records to cross-examine Smithey.

Simpson contends that the prosecution presented the EAC statistics in a misleading manner to make it appear that the prison system was more dangerous than it actually was.  For example, Smithey testified that, according to the EAC records, there were 2,044 assaults upon prison staff by prisoners in the year preceding Simpson's trial.  Simpson does not dispute the accuracy of the number of assaults reported in the EAC records, but notes that the majority of those assaults resulted in either no injury or minimal injuries.  Simpson states that the assaultive misconduct of greatest risk to staff represented less than one-twentieth of one percent of the inmates in TDCJ in 1999.

In order to prevail on a *Brady* claim, a petitioner must prove that the prosecution suppressed evidence that is materially favorable to the accused, either because it is exculpatory or impeaching. *Stickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Dickson v. Quarterman*, 462 F.3d 470, 477 (2006). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."  *United States v. Bagley,* 473 U.S. 667, 682 (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. at 682.

During the state habeas proceedings, the trial court found that Simpson was procedurally barred from asserting the *Brady* claim because he failed to object at trial or to raise the argument on direct appeal.  (State App. at 675-75.)  Citing *Wilson v. Texas*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999), the trial court also found that the claim was procedurally barred because the defense did not request a continuance to review evidence disclosed for the first time at trial.  (State App. at 680-81.)

Federal courts generally do not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failure to address the claims would result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 749-750; *Finley*, 243 F.3d at 220.  Simpson does not contend that either exception applies to his claim, so it should be dismissed as procedurally barred.

The trial court made alternative findings on the merits of Simpson's *Brady* claim.  The trial court found that, during the voir dire examination prior to Smithey's testimony before the jury, Smithey produced multiple copies of the report and advised the defense that he would rely upon it during his testimony.  (State App. at 680.)  Defense counsel did not object to any surprise and did not request a continuance to examine the report.  (State App. at 680.)  The trial court found that defense counsel appeared to have reviewed the report and used the figures contained within it during his cross-examination of Smithey.  (State App. at 680.)  Finally, the trial court found that Simpson "has failed to allege or prove how anything in the report was exculpatory or impeaching or how he was harmed by its disclosure to him at trial."  (State App. at 681.)

The trial court noted that Simpson appeared to be arguing that the prosecution had a duty to disclose that Smithey had admitted in the *Rowton* case that he was not an expert in the classification of prisoners.  (State App. at  679-80.)  However, the trial court found that Simpson misstated the

42

record with respect to this issue.  (State App. at 680-81.)  The trial court found that, in the *Rowton* case, Smithey testified that he did not consider himself to be a classification expert, but testified that he had some expertise because he had worked with classification personnel.  (State App. at 682.) The trial court noted that Smithey was allowed to testify about prison violence and classification in the *Rowton* trial after he explained his qualifications during voir dire.  (State App. at 682.)  The trial court concluded that Smithey's prior testimony in the *Rowton* case was not exculpatory and would not have impeached Smithey's credibility.  (State App. at 682.)

Simpson is not entitled to relief unless the state court's alternative findings on the merits were contrary to, or an unreasonable application of, clearly established federal law.  The Court agrees with the trial court's assessment.  The trial court's rejection of Simpson's *Brady* claims was not contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Therefore, Simpson's fifteenth claim will be denied.

## IX.  Ineffective Assistance of Counsel (Issue 16)

Simpson contends that he was denied the effective assistance of counsel because his attorneys:  (a) did not object to the seating of the jury; (b) failed to object to the jury charges in the sentencing and guilt/innocence phases of the trial; (c) allowed Simpson to waive his rights under the Fifth Amendment by making a statement to the Department of Public Safety; (d) failed to request a second change of venue; (e) failed to object to victim impact testimony; (f) failed to challenge the qualifications of an expert psychiatric witness; and (g) failed to preserve issues for appellate and habeas review.  These claims were adjudicated on the merits by the state court.  (State App. at 685-87).  Therefore, the question for the Court is whether the state court's adjudication of these claims

was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In order to establish an ineffective assistance of counsel claim, the petitioner must prove counsel's performance was deficient and the deficient performance prejudiced the petitioner's defense. *Strickland v. Washington*, 466 U.S. 668 (1984).  Because the petitioner must prove both deficient performance and prejudice, failure to prove either will be fatal to his claim. *Johnson v. Scott*, 68 F.3d 106, 109 (5th Cir. 1995).

Judicial review of counsel's performance is highly deferential. *Strickland*, 466 U.S. at 689. As a result, there is a strong presumption that counsel rendered reasonable, professional assistance and that the challenged conduct was the result of a reasoned strategy. *Strickland*, 466 U.S. at 689; *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).  To overcome the presumption that counsel provided reasonably effective assistance, the petitioner must prove his attorney's performance was objectively unreasonable in light of the facts of petitioner's case, viewed as of the time of the attorney's conduct. *Strickland*, 466 U.S. at 689-90.  A reasonable professional judgment to pursue a certain strategy should not be second guessed. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).

In addition to demonstrating counsel's performance was deficient, the petitioner must also show prejudice resulting from counsel's inadequate performance. *Strickland*, 466 U.S. at 691-92. The petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  Mere allegations of prejudice are insufficient; the petitioner must affirmatively prove, by a preponderance of the

evidence, that he was prejudiced as a result of counsel's deficient performance. *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994), *cert. denied*, 514 U.S. 1071 (1995).

First, Simpson argues that counsel's failure to properly object may have resulted in the procedural default of his jury selection claims.  The Court found that the claims concerning jury selection lack merit.  Therefore, counsel was not ineffective for failing to object to the seating of the jury.  *See United States v. Gaudet,*  81 F.3d 585, 591 (5th Cir. 1996) (concluding that failing to pursue an avenue of argument that has no validity or hope of success is not deficient performance).

Next, Simpson contends that counsel may have waived jury charge issues by failing to object. Simpson does not identify any issues that may have been waived by counsel's failure to object. Elsewhere in his petition, Simpson raises issues concerning the jury charge and special issues in the punishment phase.  However, the Court has found that those claims lack merit.  Therefore, counsel was not ineffective by failing to object to the jury charges.

Simpson contends that his attorney should not have allowed him to waive his Fifth Amendment rights and speak with police about the crime.  On February 9, 2000, after Simpson had been charged with capital murder, his attorney arranged for him to meet with a state trooper named Rudy Flores.  Trooper Flores met Simpson and his attorney at the jail and drove them to an open field in Palestine where Simpson attempted to lead Flores to evidence of the murder.[15]  Simpson's attorney instructed Simpson to tell Flores what happened, and Simpson admitted that he, his wife, and his cousin burglarized the victim's house and kidnapped her.  Simpson said that he stayed in the car while the others beat the victim and threw her in the river.

---

[15]        The search was unsuccessful because the evidence at that scene, including Davidson's glasses and a pair of gloves, had already been collected.

At Simpson's attorney's request, his statements were not recorded, although Flores did make notes.   Simpson's attorney moved unsuccessfully to have his statements suppressed, but the statements were never introduced at trial.

Under *Strickland*, the Court presumes that Simpson's counsel's decision to have him cooperate with the police resulted from sound strategy.  Simpson concedes that counsel initiated the interview to try to lay the ground work for a favorable plea agreement by lessening Simpson's culpability and showing his good faith willingness to assist officers in resolving the crime.  Simpson contends that his attorney should have investigated further before accepting Simpson's story that he was only mildly culpable and should have negotiated favorable terms with the officer or prosecutor before offering the information.

Assuming, without deciding, that counsel's performance was deficient, Simpson has not demonstrated that there is a reasonable probability that, had his counsel taken appropriate action, the result in his case would have been different.  On state habeas review, the trial court found that Simpson "admits that none of his statements to the officers were admitted in evidence, he admits that counsel had a plausible strategy of attempting to lessen [Simpson's] culpability and avoid the death penalty, and he fails to allege or prove how [Simpson] was harmed by counsel's actions."  The Court finds that the state court's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.  Nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence.

Simpson contends that counsel should have filed a second motion to change venue so that the case would be transferred to a county with a larger population of African-Americans.  On state habeas review, the trial court found that Simpson "failed to allege or prove how counsel's actions were deficient or how counsel might conceivably have convinced this Court to move the trial to a

46

'minority' county, he has failed to allege or prove that the jury seated in Henderson County did not provide him a fair trial, and he has failed to allege or prove how he was harmed by counsel's failure to make such a request which had no basis in law."   (State App. at 686.)   Simpson has not demonstrated that this finding is contrary to, or involves an unreasonable application of, clearly established federal law, or results in a decision that is based on an unreasonable determination of the facts in light of the evidence.

Simpson complains that, other than objecting to a statement that the victim's family called for the death penalty, counsel did not object to victim impact testimony during the punishment phase. Victim impact testimony is generally admissible in the punishment phase of a capital trial.  *Payne v. Tennessee,* 501 U.S. 808, 823-27 (1991).  Simpson has not directed the Court's attention to any particular victim impact testimony that he finds objectionable, or demonstrated that he was prejudiced by counsel's failure to object more than once.  Therefore, this claim is conclusory and lacks merit.

Simpson asserts that counsel should have objected to the testimony of Dr. David Self, a psychiatrist who opined that there was a probability that Simpson would be dangerous in the future. Simpson contends that such testimony has been criticized on the grounds that predictions of future dangerousness by mental health experts have not been proven to be any more accurate than predictions made by lay persons.  *See, e.g., Flores v. Johnson*, 210 F.3d 456, 458-70 (5th Cir.) (Garza, J., concurring), *cert. denied*, 531 U.S. 987 (2000).  Under *Strickland,* however, the Court must presume that counsel's actions were the result of sound trial strategy.  Psychiatric testimony as to the likelihood of an inmate's future dangerousness is admissible.  *Barefoot,* 463 U.S. at 897-99. Therefore, the Court presumes that Simpson's counsel did not object to this testimony because he reasonably believed that objecting would have been futile.  Simpson argues that the holding in

*Barefoot* is in doubt in light of *Daubert*, and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), and, therefore, a defense lawyer is required to challenge the qualifications of experts testifying as to a defendant's future dangerousness.  This argument was rejected by the Fifth Circuit.  *Johnson,* 306 F.3d at 254-55.  Because *Johnson* is binding on this Court, the Court finds that Simpson has failed to establish that counsel's failure to object to the expert testimony of Dr. Self constituted deficient performance.

Finally, Simpson contends that counsel failed to preserve issues for appeal and habeas review.  Without specifying which issues, Simpson contends that if this Court finds that any of the issues raised in this petition have been procedurally defaulted, the default was the result of ineffective assistance of counsel.  Although the Court found that some of Simpson's claims were procedurally defaulted, those claims were also reviewed on the merits.  The Court did not find that any of the procedurally defaulted claims were meritorious.  Therefore, counsel did not perform deficiently by failing to raise the issues.

Simpson has not demonstrated that counsel performed deficiently, or that he was prejudiced by counsel's performance.  As a result, the Court finds that the state court's denial of the ineffective assistance of counsel claims was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

*X.  Mental Incompetence (Issue 17)*

Simpson contends that executing him would constitute cruel and unusual punishment because he is not mentally competent.  *See Ford v. Wainwright*, 477 U.S. 399, 410 (1986) (holding that the Eighth Amendment prohibits the execution of a prisoner who is insane).  The state trial court found that this claim was premature, because competency to be executed cannot be determined until the execution is imminent.  (State App. at 703-04.)  A *Ford* claim is not ripe until an execution date has

been scheduled and execution is imminent.  *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998); *Billiot v. Epps*, 107 Fed.Appx. 385, 387 (5th Cir. 2004), *cert. denied*, 544 U.S. 950 (2005). Therefore, the Court will deny Simpson's seventeenth claim without prejudice.

XI.  *Sufficiency of Evidence to Support Finding of Future Dangerousness (Issue 18)*

  Simpson contends that executing him would constitute cruel and unusual punishment and deny him due process because the evidence submitted at the punishment phase of his trial was legally insufficient to support the jury's finding of future dangerousness.  In this instance, the test for legal sufficiency is whether a rational juror, viewing the evidence in the light most favorable to the verdict, could have found beyond a reasonable doubt that there was a probability that Simpson would commit acts of criminal violence which would constitute a continuing threat to society.  *See Jackson v. Virginia*, 443 U.S. 307, 323 (1979); *Woods v. Cockrell*, 307 F.3d 353, 357-58 (5th Cir. 2002). Simpson contends that a rational jury could not have found beyond a reasonable doubt that Simpson would be a continuing threat to society because the defense's expert witnesses testified that Simpson would not pose a threat in a controlled prison environment.

  During the state habeas proceedings, the trial court found that Simpson was procedurally barred from challenging the sufficiency of the evidence because he did not raise the argument on direct appeal.  (State App. at 705.)  Simpson has not demonstrated that he had good cause for failing to fairly present his claims, or that the federal court's failure to address the claims would result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 749-750; *Finley*, 243 F.3d at 220. Therefore, the claim should be dismissed as procedurally barred.

  The trial court also considered the merits of the claim.  The trial court found that the facts of the case were sufficient to justify an affirmative answer to the future dangerousness special issue because the crime was calculated and pointless, and was vicious and sadistic in its commission.

(State App. at 706.)  The trial court found that the record proved that Simpson had a history of criminal behavior and an inability to conform to probation conditions.  (State App. at 706.)  The trial court found persuasive the prosecution's psychiatric expert who testified that Simpson has anti-social personality disorder, that he exhibits traits suggesting he is psychopathic, and that there is a high risk that he would commit future acts of violence.  (State App. at 706.)

The trial court concluded that the evidence was "abundantly sufficient" to prove Simpson's future dangerousness.  Simpson is not entitled to relief unless he demonstrates that this finding is contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Simpson has not met this burden.  Thus, the Court will deny Simpson's eighteenth claim.

*XII.  Mitigation Instruction Gave Jury Unlimited Discretion (Issue 19)*

In his nineteenth ground for review, Simpson alleges he was denied due process and was subjected to the arbitrary and capricious infliction of the death penalty because the statutory mitigation instruction gave the jury too much discretion.  On state habeas review, the trial court found that Simpson was procedurally barred from asserting this claim because he did not object at trial and did not raise the issue on direct appeal.  (State App. at 707.)  Simpson offers no explanation for the procedural default.  Thus, Simpson is procedurally barred from raising this claim in this federal habeas proceeding.

The trial court also found that Simpson was not entitled to relief on the merits of the claim.  (State App. at 707.)  Simpson is not entitled to federal habeas relief unless the state court's alternative findings on the merits were contrary to, or involved an unreasonable application of, clearly established federal law.

The Supreme Court has recognized two different aspects of the capital sentencing process, eligibility for the death penalty and the selection phase. *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998); *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). During the eligibility phase, the class of defendants eligible for the death penalty is narrowed, often by consideration of aggravating circumstances. *Buchanan*, 522 U.S. at 275. In Texas, a defendant's eligibility for a death sentence is determined in the guilt/innocence phase. *Woods*, 307 F.3d at 359. Once that eligibility is determined, the trial proceeds to the punishment phase where the jury selects either death or life imprisonment. *Woods*, 307 F.3d at 359. A state may, if it chooses, give the jury unbridled discretion during the selection process to decide whether to spare a death-eligible defendant's life. *See Tuilaepa,* 512 U.S. at 979-80; *Woods*, 307 F.3d at 359. Since a state may provide jurors with unbridled discretion in the context of mitigation, a claim that a jury instruction on mitigation gives too much discretion must fail. The Court finds that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. The Court will deny Simpson's nineteenth claim.

## XIII.  Mitigation Instruction Sent "Mixed Signals" to the Jury (Issue 20)

Citing *Penry v. Johnson*, 532 U.S. 782, 804-05 (2001) (*Penry II*), Simpson contends his constitutional rights under the Fourteenth and Eighth Amendments were violated by jury instructions at the punishment phase of his trial that sent "mixed signals" to the jury. In *Penry II*, the Supreme Court noted that the jury must be able to consider and give full effect to a defendant's mitigating evidence in imposing a sentence. *Penry II*, 532 U.S. at 797. The Supreme Court found that the jury could not give effect to Penry's mitigating evidence because there was no question concerning mitigation. *Penry II*, 532 U.S. at 788-89 (describing the special issues put before the jury). Instead,

jurors were given a nullification instruction which directed them to answer a question falsely, in violation of their oaths, if they wished to assess a life sentence. *Penry II*, 532 U.S. at 797-800.

During the state habeas proceedings, the trial court found that the "mixed signals" claim was procedurally barred, but also lacked merit.  (State App. at 708-09.)  Simpson has not shown cause for the procedural default, actual prejudice resulting from the alleged error, or that imposition of the procedural bar would result in a miscarriage of justice.  Therefore, the claim should be dismissed as procedurally barred.  In the alternative, the claim lacks merit.  Simpson is only entitled to relief if the trial court's alternative ruling on the merits was contrary to, or involved an unreasonable application of, clearly established federal law.

The trial court noted that the "mixed signals" issue addressed in *Penry II* resulted from a non-statutory nullification instruction given before the 1991 amendment to the Texas Code of Criminal Procedure which added the current statutory mitigation instructions and special issue.  (State App. at 709.)  The nullification instruction at issue in *Penry II* was not given in this case.

At the punishment phase of Simpson's trial, the jury was instructed to determine whether Simpson acted deliberately and whether there was a probability that Simpson would commit acts of criminal violence that would constitute a continuing threat to society.  If the jury answered these questions affirmatively, it was required to determine whether there was a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than death, taking into account all of the evidence, including the circumstances of the offense, Simpson's character and background, and his personal moral culpability.  (Clerk's Record, Vol. VII at 1095-96.)  Simpson contends that these special issues sent "mixed signals" to the jury.  This argument lacks merit because the Supreme Court has approved similar instructions.  *See Angelone,* 522 U.S. at 277.

Therefore, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

*XIV.  Expert Testimony Regarding Future Dangerousness (Issues 21, 22 & 23)*

Simpson contends that he was denied a fair trial by the admission of unreliable expert testimony regarding his future dangerousness.  Citing *Daubert* and *Kumho Tire*, Simpson argues that the State's psychiatrist, Dr. David Self, lacked sufficient qualifications to testify as an expert and his opinion that Simpson was a future danger lacked scientific reliability.  Simpson argues that, because the testimony was unreliable, it violated his Fourteenth Amendment right to due process.

During the state habeas proceedings, the trial court found that these claims lack merit.  (State App. at 709-12.)  Therefore, Simpson is not entitled to relief unless the state court's determinations were contrary to, or involved an unreasonable application of, clearly established federal law.

The Supreme Court has held that psychiatric testimony concerning future dangerousness is admissible.  *Barefoot,* 463 U.S. at 901; *Johnson*, 306 F.3d at 255; *Tigner*, 264 F.3d at 526-27.  To hold otherwise on habeas review would constitute a new rule of criminal procedure, in violation of *Teague. Tigner*, 264 F.3d at 527.  Although Simpson argues that Dr. Self was unqualified to testify as an expert, he offered no support for this conclusory allegation.  *See United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993) (holding that conclusory allegations are insufficient to raise a constitutional issue).

Simpson's claims concerning the admissibility of Dr. Self's testimony lack merit.  Therefore, the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law.  Simpson is not entitled to relief on his twenty-first, twenty-second, or twenty-third grounds for review.

*XV.   Special Sentencing Issue Required Jurors to Weigh Mitigating Circumstances Against Aggravating Circumstances (Issues 24, 25, 26, 27, 28 & 29)*

Simpson raises six related claims concerning the constitutionality of the special issue concerning mitigation.  Simpson contends that the mitigation special issue required jurors to weigh mitigating circumstances against aggravating circumstances.  In claims twenty-four through twenty-nine, Simpson argues that the special issue violates the due process clause and the cruel and unusual punishment clause because it:  (a) does not provide a means for jurors to give effect to the mitigating circumstances;  (b) shifts the burden of proof to the defendant to prove that sufficient mitigating circumstances exist to warrant a life sentence; and (c) does not require jurors to consider mitigating circumstances alone in determining whether a life sentence is warranted.

During the state habeas proceedings, the trial court found that the claims concerning the mitigation special issue were procedurally barred because Simpson did not object at trial or raise the claims on direct appeal.  (State App. at 666-67.)  Simpson has not shown cause for the procedural default, actual prejudice resulting from the alleged error, or that imposition of the procedural bar would result in a miscarriage of justice.  Therefore, the claims are not reviewable in a federal habeas petition.

In the alternative, the trial court reviewed the merits of Simpson's claims and found that they lacked merit.  (State App. at 668-71.)  Simpson is only entitled to relief if the trial court's alternative rulings on the merits were contrary to, or involved an unreasonable application of, clearly established federal law.

The trial court noted that the mitigation issue is designed to permit consideration of facts and circumstances particular to a defendant which do not necessarily relate to the offense or its circumstances.  (State App. at 669.)  The trial court found that the mitigation special issue is not an

element of the offense which must be found by the jury beyond a reasonable doubt.  Rather, the mitigation special issue acts as a defensive issue which inures to the benefit of the defendant because it can reduce the sentence to life imprisonment.  (State App. at 669.)  The trial court noted that the Texas Court of Criminal Appeals had rejected the same claims in *Mosley v. State*, 983 S.W. 2d 249, 262-63 (Tex. Crim. App. 1998).  (State App. at 670.)

Texas' capital sentencing scheme makes it a "non-weighing state" in that it does not require the jury to "weigh" aggravating factors against mitigating factors.  *Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000).  As discussed previously, in Texas, the jury considers aggravating factors in the guilt/innocence phase of the trial where the defendant's eligibility for a death sentence is determined.  *Woods*, 307 F.3d at 359.  If the jury finds an aggravating factor in the guilt/innocence phase, the defendant is eligible for a death sentence.  *Hughes*, 191 F.3d at 623.  During the punishment phase, the jury selects either death or life imprisonment.  *Woods*, 307 F.3d at 359.  The jury instructions and special issues must allow the jury to consider and give full effect to a defendant's mitigating evidence in imposing a sentence.  *Penry II*, 532 U.S. at 797.  However, the jury may be given unbridled discretion to decide whether to spare the defendant's life.  *Tuilaepa*, 512 U.S. at 979-80; *Woods*, 307 F.3d at 359.

Simpson does not allege that the jury was unable to consider and give full effect to any particular mitigating evidence he presented.  Instead, he contends that the special issues would not provide a juror with the means to impose a sentence of life imprisonment if the juror feels mercy or compassion for the defendant, or has religious views inconsistent with imposing a death sentence, or feels that the defendant should have a chance for salvation or rehabilitation.

As explained previously, the special issues in the punishment phase of Simpson's trial required the jurors to determine whether Simpson would be a danger in the future, and whether he

actually caused, or intended to cause, the death of the victim.  If they answered "yes" to the first two issues, the instructions required the jury to determine whether, considering the circumstances of the crime, Simpson's character and background, and his personal moral culpability for the crime, his life should nevertheless be spared.  The mitigation special issue did not provide a means for jurors to vote to spare Simpson's life based upon their own mercy, compassion, and religious views, including Simpson's chances for "salvation," because the instruction required them to make their decision based only upon what they knew about Simpson and his crime.  This is precisely what the Constitution requires.  *See Johnson v. Texas,* 509 U.S. 350, 371-72 (1993) (holding that the State is not required to allow jurors a vehicle to vote against the death penalty on the basis solely of sympathy or mercy).  Simpson's contention that the special issues did not allow the jurors to give effect to his chances for rehabilitation, however, is incorrect; this could have been considered within the context of Simpson's character and background.

Simpson also contends that the mitigation special issue impermissibly shifted to him the burden of proving that sufficient mitigating circumstances exist to warrant sparing his life.  This claim has been rejected by the Fifth Circuit.  *Hughes*, 191 F.3d at 625-26.  Simpson complains that the mitigation special issue did not require the jury to consider mitigating circumstances alone in determining whether his life should be spared.  Instead, the special issue allowed the jury to consider all of the evidence, including the circumstances of the offense.  Simpson has not cited any Supreme Court authority for the proposition that jurors must consider mitigating circumstances by themselves in determining whether to spare the defendant's life.  To the contrary, the Supreme Court has held that it is not necessary to channel the jury's discretion to decide issues of mitigation.  *Tuilaepa*, 512 U.S. at 979.

Simpson has not demonstrated that the mitigation special issue violated the due process clause or the cruel and unusual punishment clause. Therefore, the state court's denial of claims twenty-four through twenty-nine was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. The Court will deny these claims.

*XVI. Failure to Inform Jury of Effect of Single "No" Vote (Issues 30 & 31)*

Simpson's thirtieth claim is that his death sentence constitutes cruel and unusual punishment and denies him the due process of law because the trial court did not inform the jurors that a single "No" vote to either of the first two special issues, or a single "Yes" vote to the mitigation issue would result in a life sentence. During the state habeas proceedings, the trial court found that this claim was procedurally barred. (State App. at 712-13.) Procedurally defaulted claims are not reviewed in federal court unless the petitioner demonstrates good cause for failing to present the claims, and prejudice from not being given an opportunity to raise the claims, or that the court's failure to address the claims would result in a fundamental miscarriage of justice. Simpson has not met this burden. Therefore, the claim is not reviewable by a federal court.

In the alternative, the trial court found that the claim lacked merit. (State App. at 713.) Simpson is not entitled to relief unless he demonstrates that the trial court's alternative ruling on the merits is contrary to, or an unreasonable application of, clearly established federal law.

Pursuant to Texas law, the jury was instructed that a "Yes" answer to either of the first two special issues or a "No" answer to the mitigation special issues required jury unanimity. The jury was also instructed that they could only answer "No" to either of the first two special issues, and "Yes" to the mitigation issue if ten or more jurors agreed. The jury was not advised that a hung jury on any of the special issues would result in a life sentence.

57

Simpson's claim concerning jury instructions on the result of a hung jury has been rejected by the Fifth Circuit. *Alexander v. Johnson,* 211 F.3d 895, 897 (5th Cir. 2000) (holding that *Teague* barred the creation of a new rule in a federal habeas proceeding which would require that jurors be informed of the consequences of a hung jury in the punishment phase). Therefore, the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law.

Simpson also claims that the trial court violated the Texas Constitution by failing to inform the jurors of the consequences of a hung jury. Because federal habeas relief may only be granted for violations of the Constitution, laws, or treaties of the United States, an alleged violation of a state constitution does not state a ground for which relief can be granted. *Chenault v. Stynchcombe,* 581 F.2d 444, 448 (5th Cir. 1978).

*XVII. State Failed to Disclose Agreements With Witnesses (Issues 32, 33, & 34)*

Simpson contends that the prosecution failed to disclose the favorable disposition of crimes committed by six witnesses who testified against him: Tim West, Brian Hunt, Michael Davis, Trelisha Clerkley, Christina Walker, and Kenosha Walker. Simpson argues that the State's failure to disclose this information violated *Brady v. Maryland*, and his Constitutional rights under the due process, equal protection, and confrontation clauses. The state court adjudicated these claims on the merits. (State App. at 688-99.) Therefore, federal habeas relief may not be granted unless the state court ruling was contrary to, or an unreasonable application of, clearly established federal law.

Due process is violated when the prosecution withholds evidence that is both favorable to the accused and material to either guilt or punishment. *Brady*, 373 U.S. at 87 (1963); *Johnson v. Dretke*, 394 F.3d 332, 336 (5th Cir. 2004). In order to prevail on a *Brady* claim, the defendant must prove that the prosecution suppressed or withheld evidence which is favorable material to the defense. *United States v. Stephens,* 964 F.2d 424, 435 (5th Cir. 1992). Evidence is material if there

58

is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *Bagley,* 473 U.S. at 682.

During the state habeas proceedings, the trial court found that there were no undisclosed agreements between the prosecution and the six witnesses. (State App. at 688-99.) This is a finding of fact which must be accepted unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Simpson's evidence--that the witnesses do not appear to have been prosecuted--does not clearly and convincingly rebut the trial court's finding that there were no undisclosed plea agreements. Because Simpson cannot establish the first element of his *Brady* claim, the Court finds that the state court's denial of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence.

*XVIII.  Jury's Answer to Future Dangerousness Special Issue Not Reviewable on Appeal (Issue 35)*

Simpson contends that his death sentence is unconstitutional because the Texas Court of Criminal Appeals declines to review the jury's answer to special issue two concerning future dangerousness. On state habeas review, the trial court found that this claim was procedurally barred because Simpson did not object at trial or appeal the issue. (State App. at 712-13.) Procedurally defaulted claims are not reviewed in federal court unless the petitioner demonstrates good cause for failing to present the claims, and prejudice from not being given an opportunity to raise the claims, or that the court's failure to address the claims would result in a fundamental miscarriage of justice. Simpson has not met this burden. Therefore, the claim is not reviewable by a federal court.

In the alternative, the trial court found that the claim lacked merit. (State App. at 713-14.) Simpson is not entitled to relief unless he demonstrates that the trial court's alternative ruling on the merits is contrary to, or an unreasonable application of, clearly established federal law.

Simpson's thirty-fifth claim lacks merit in several respects.  First, the second special issue submitted in Simpson's trial concerned whether Simpson actually caused, or intended to cause, the death of the victim, not whether Simpson was a future danger.  (CR, Vol. VIII at 1095.)  Second, Simpson mistakenly cites *Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996), for the proposition that the Texas Court of Criminal Appeals will not review a jury's determination concerning future dangerousness.  In fact, the Texas Court of Criminal Appeals does review the sufficiency of evidence to support a jury's finding that a capital defendant would be a future danger to society.  *See, e.g., Guevara v. State*, 97 S.W.3d 579, 581 (Tex. Crim. App. 2003) (reviewing the sufficiency of evidence on future dangerousness).  The Texas Court of Criminal Appeals does not review the jury's decision on the mitigation special issue.  *Eldridge*, 940 S.W.2d at 652.  However, it is not required to do so.  There is no constitutional requirement that the mitigation special issue be subject to appellate review.  *Rowell*, 398 F.3d at 378; *Woods*, 307 F.3d at 359-60.  Therefore, the state court's determination was not contrary to, or an unreasonable application of, clearly established federal law.

## XIX.  Defective Jury Instructions on Mitigation (Issues 36 & 37)

Simpson contends that the jury instructions and special issues at the punishment phase of his trial failed to adequately explain the concept of mitigating evidence and define key terms, denying him equal protection, due process, and a fair trial, and rendering his death sentence cruel and unusual punishment.

On state habeas review, the trial court found that these claims were procedurally barred because they were not raised at trial or on direct appeal.  (State App. at 712-13.)  Procedurally defaulted claims are not reviewed in federal court unless the petitioner demonstrates good cause for failing to present the claims, and prejudice from not being given an opportunity to raise the claims,

or that the court's failure to address the claims would result in a fundamental miscarriage of justice. Simpson has not met this burden.  Therefore, the claims are not reviewable by a federal court.

In the alternative, the trial court found that the claims lacked merit.  (State App. at 714-16.) Simpson is not entitled to relief unless he demonstrates that the trial court's alternative ruling on the merits is contrary to, or an unreasonable application of, clearly established federal law.

The trial court found that counsel's arguments concerning the "omission of any reference to mitigating circumstances, and the failure to define 'deliberately,'" were based on a pre-1991 statute not applicable to his case.  (State App. at 715.)  The trial court found that the jury charge was proper and that the court was not constitutionally required to define the commonly used words contained in the special issues, even if Simpson had objected and requested definitions at trial.  (State App. at 715.)

During the punishment phase, the jury was given the following instruction concerning mitigation:

4.

You shall consider all evidence submitted to you during the whole trial as to the Defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

. . . .

7.

You are instructed that the term "mitigating evidence," as used herein, means evidence that a juror regards as reducing the Defendant's moral blameworthiness.

8.

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider relevant mitigating circumstances, if any, supported by the evidence, presented in both phases of the trial, whether presented by the State or the Defendant.  A mitigating circumstance may include, but is not

limited to, any aspect of the Defendant himself or his character, background, record, or the circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them, to the extent you have given them weight, if any in assessing the Defendant's personal culpability at the time you answered the special issues.

(CR, Vol. VII at 1091.)   The jurors were then directed to answer the following special issues:

### Special Issue No. 1

Is there a probability that the Defendant, DANIELLE SIMPSON, would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue No. 2

Did the Defendant, DANIELLE SIMPSON, actually cause the death of Geraldine Davidson, the deceased, on the occasion in question, or, if he did not actually cause deceased's death, he intended to kill the deceased or another or he anticipated that a human life would be taken?

You are instructed that in answering this issue only the conduct of the defendant, DANIELLE SIMPSON, may be considered, and that the instructions pertaining to the law of parties heretofore given you can not now be considered in answering this issue.   If any juror has any reasonable doubt as to his answer to this issue, the juror shall vote "NO."

### Special Issue No. 3

Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

In the punishment phase of a capital case, jurors must be able to give effect to mitigating evidence.  *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).   To determine whether the jury instructions satisfy this principle, a court must consider whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.  *Boyde v. California*, 494 U.S. 370, 380 (1990).

62

The Supreme Court has held that the failure to instruct the jury on the concept of mitigation and particular mitigating factors does not violate the Constitution. *Buchanan,* 522 U.S. at 278. Therefore, Simpson's complaint that the jury was not instructed on the concept of mitigation lacks merit. The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

In his thirty-seventh ground for review, Simpson argues that the jury instructions failed to adequately explain several terms used in the special issues at the punishment phase of the trial. Simpson contends that the terms "deliberately" and "reasonable expectation," used in the first special issue, are undefined. This argument lacks merit because neither of these terms appears in any of the special issues. Simpson also complains that the terms "probability," "criminal acts of violence," "continuing threat," and "society" are undefined. *Id.* However, the Fifth Circuit has held that the failure of the jury instructions to define these terms does not violate the Constitution. *Jacobs v. Cockrell*, 54 Fed. App. 409, at *4 (5th Cir. 2002) (citing *Netherey v. Johnson,* 993 F.2d 1154 (5th Cir. 1993), *cert. denied,* 511 U.S. 1026 (1994), and *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir.), *cert. denied*, 509 U.S. 947 (1993)), *cert. denied*, 538 U.S. 949 (2003). As a result, this claim also lacks merit. The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

*XX.  Death Penalty Unconstitutional Because No Option of Life Without Parole (Issue 38)*

Finally, Simpson contends that his death sentence constitutes cruel and unusual punishment because the jury was not given the option of sentencing him to life without the possibility of parole. This claim was adjudicated on the merits by the state court (State App. at 714-16), so the question for the Court is whether the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law.

63

At the time of Simpson's trial, Texas law allowed two sentencing options for a person convicted of capital murder:  life in prison with the possibility of parole, or death.  Simpson contends that, although the Supreme Court has never held that the Constitution requires states to provide life without parole as a sentencing option, "the Court may take the next step and require states to offer life without parole."  (State App. at 202-03.)

As Simpson acknowledges, the Supreme Court has never held that states must offer the option of a life sentence without parole in capital cases.  In addition, the Fifth Circuit has held that a capital sentencing scheme that does not offer life without parole as an option is not constitutionally infirm.  *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986).  Thus, this Court has no basis upon which to overturn the state court's rejection of the claim.

### Conclusion

For the above reasons, the Court will deny the petition for writ of habeas corpus.  The Court will enter a judgment in accordance with this Memorandum Opinion.

So **ORDERED** and **SIGNED** this **29** day of **March, 2007.**

_____
Ron Clark, United States District Judge