IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DANIELLE SIMPSON, | § | |
| | § | |
| *Petitioner,* | § | |
| | § | Civil Action No. 1:04-CV-485 |
| v. | § | |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | JUDGE RON CLARK |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| *Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Danielle Simpson was convicted of capital murder and sentenced to death by the 3rd Judicial District Court of Anderson County, Texas. While the case worked its way through the state courts, the United States Supreme Court held that it was unconstitutional to execute a mentally retarded person. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (2002). The Court reviewed definitions of mental retardation set out in standard references[1], leaving it to each State to develop appropriate criteria for determining whether an offender was mentally retarded. *Id.* at 308, n. 3, 317, 122 S. Ct. 2242, 2245, 2250. After Petitioner's direct appeal and state habeas petition were denied, the Texas Court of Criminal Appeals held that the determination would be made under the criteria established by the American Association on Mental Retardation (AAMR) or by Tex. Health & Safety Code §591.003(13). *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). The Court of Criminal Appeals subsequently affirmed

---

[1]Am. Ass'n on Mental Retardation, <u>Mental Retardation: Definition, Classification, and Systems of Supports</u> 5 (9th ed. 1992); Am. Psychiatric Ass'n., <u>Diagnostic and Statistical Manual of Mental Disorders</u> 41 (4th ed. 2000) (cited in this Order as DSM-IV-TR [page] (4th ed. 2000)).

the lower court's denial of Petitioner's state habeas petition, taking into consideration the decisions in *Atkins* and *Briseno*.

Petitioner then filed a petition for writ of habeas corpus in this court pursuant to 28 U.S.C. § 2254. He presented thirty-nine claims for relief, including two concerning his alleged mental retardation. After reviewing the full record developed in the state courts, this court denied the petition. The Fifth Circuit Court of Appeals remanded the case for the limited purpose of conducting "an evidentiary hearing on the issue of whether Simpson is mentally retarded, and thereafter to reconsider its denial of relief as to Simpson's mental retardation claim, with respect to which we express no opinion." *See* Doc. # 49 at p. 2.

The court has carefully considered the record, the new evidence and testimony presented at the hearing, and the arguments of counsel. Whether the evidence is evaluated under the Texas statutory standard, the AAMR criteria, or the similar definition of DSM-IV-TR, the result is the same. The court finds that Petitioner is not mentally retarded, as that term is defined by those references. Accordingly, Petitioner's habeas corpus claims asserting mental retardation are denied.

## I. Background

During the morning of January 26, 2000, Petitioner Danielle Simpson, his sixteen year old wife Jennifer Simpson, and thirteen year old cousin Edward McCoy were burglarizing the home of Geraldine Davidson, an eighty-four year old widow and retired teacher. Petitioner was twenty years old at the time. When Mrs. Davidson came home during the burglary, Petitioner and his cohorts tied her up with duct tape, placed her in the trunk of her car, and spent the afternoon driving the car around and occasionally showing Mrs. Davidson off to friends. Later

that day, the trio picked up Petitioner's fifteen year old brother Lionel Simpson. After stopping

for food and to smoke marijuana, the foursome drove to the Neches River where Petitioner and

Lionel tied Mrs. Davidson's legs to a cinder block, beat her with a gardening shovel, and finally

threw her in the river. Petitioner then "rented" Mrs. Davidson's car to several friends in return

for drugs. Police arrested Petitioner the following day.

Petitioner was convicted of capital murder in December 2000[2] in Cause No. 25200, styled

*State of Texas v. Danielle Simpson*, and the conviction was affirmed. He filed a writ of habeas

corpus in state court on December 3, 2002. Accompanying this writ were two volumes of

material, including treatise excerpts in support of his mental retardation claim, law review and

behavioral science articles, and various affidavits. Based at least in part on the comprehensive

and thorough treatment of Petitioner's mental retardation claims during the punishment phase,

the trial court handling Petitioner's state habeas claims decided not to hold an evidentiary

hearing, a decision which was affirmed on appeal by the Texas Court of Criminal Appeals.[3]

---

[2]There is a discrepancy in the Court of Criminal Appeals opinions on the date of Petitioner's conviction. The 2003 opinion affirming his conviction on direct appeal gives the date as December 2000, *see Simpson v. State*, 119 S.W.3d 262, 264 (Tex. Crim. App. 2003), while the 2004 opinion affirming the trial court's denial of habeas relief states Petitioner was convicted in November 2002. *See Ex parte Simpson*, 136 S.W.3d 660, 661 (Tex. Crim. App. 2004). The jury charge and verdict form, both of which can be found on Westlaw, indicate that December 2000 is the correct date. Petitioner's TDCJ records state that he was "received" onto death row on December 18, 2000.

[3]Petitioner was sentenced to death before the Supreme Court's 2002 decision in *Atkins v. Virginia.* The trial court considered Petitioner's state habeas claim prior to the Texas Court of Criminal Appeals' 2004 opinion in *Ex parte Briseno.* Nevertheless, as found by the Texas Court of Criminal Appeals, the state habeas trial court followed the methodology and legal standards set out in *Briseno. Ex parte Simpson*, 136 S.W.3d 660, 666 (Tex. Crim. App. 2004).

During the punishment phase of Petitioner's capital murder trial, the defense called a psychologist, Dr. Paul Andrews; a pediatric neurologist, Dr. Wise; and a psychiatrist, Dr. Barry Mills, to testify as to Petitioner's mental condition and abilities. The results of two separate sets of intelligence tests performed at ages 14 and 15 using the Wechsler Intelligence Scale for Children, 3rd Edition (WISC-III) and the Test of Non-Verbal Intelligence (TONI-2) were also admitted during the punishment phase[4], as were the rebuttal testimony of the State's psychiatrist, Dr. David Self; letters written by Petitioner while awaiting trial in 2000; and the testimony of his parents and sisters. When considering the state habeas petition the District Court also had the benefit of Petitioner's school records; his written statements to the police after the murder of Mrs. Davidson; twenty inmate request forms Petitioner submitted while in jail awaiting trial; more letters he wrote to friends and family from jail, including a letter to a venire panel member whose address he memorized during voir dire; and Petitioner's mental health records from the Texas Department of Criminal Justice (TDCJ), including a score of 84 on the TONI obtained shortly after his arrival on death row. The state District Court denied Petitioner's state habeas petition in a comprehensive ninety-five page opinion.

On October 1, 2003, the Texas Court of Criminal Appeals affirmed Petitioner's conviction on direct appeal. *Simpson v. State*, 119 S.W.3d 262 (Tex. Crim. App. 2003). Certiorari was denied by the Supreme Court on June 14, 2004. The Texas Court of Criminal Appeals affirmed the trial court's denial of state habeas relief on June 30, 2004. *Ex Parte Simpson*, 136 S.W.3d 660 (Tex. Crim. App. 2004). Petitioner filed his petition for writ of habeas

---

[4]For a description of the WISC-III, TONI-2, and the other tests discussed in this Order, see the Appendix to this opinion.

corpus in this court on June 28, 2005, which was denied on March 29, 2007. The Fifth Circuit remanded the case on August 29, 2008 for a hearing on Petitioner's mental retardation claims.

After the case was remanded, this court approved Petitioner's request to retain investigator/social worker Ms. Toni Knox; neuropsychologists Dr. Joan Mayfield and Dr. Cecil Reynolds; and neuroradiologist Dr. Kendall Jones. The parties submitted copies of all expert reports and other exhibits upon which they relied (including exhibits and trial transcript excerpts from the state court record), which this court reviewed prior to the hearing. The hearing was conducted between December 8 and 10, 2008.

## II. Standard of Review and Burden of Proof on Remand

A.      Standard of Review - Claim Adjudicated on the Merits by State Court

Relief in a habeas corpus case may not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication resulted in a decision that involved an unreasonable application of clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2). A decision is contrary to clearly established federal law if the state court reaches a conclusion which contravenes a decision reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). Pure questions of law and mixed questions of law and fact are reviewed under Section 2254(d)(1), while pure questions of fact are reviewed under Section 2254(d)(2). *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2000).

Section 2254(e)(1) also provides that in a habeas proceeding pursuant to a state court judgment, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." If the state court did not adjudicate the claim on its merits, a federal court must determine the claim *de novo*. *Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000).

The standard of review intended by the Fifth Circuit in this case is somewhat unclear. The order remanding the case directed this court "to conduct an evidentiary hearing on the issue of whether Simpson is mentally retarded, and thereafter to reconsider its denial of relief as to Simpson's mental retardation claim, with respect to which we express no opinion." *See* Doc. # 49 at p. 2. Respondent argues that the Fifth Circuit's remand required this court to first hold a comprehensive evidentiary hearing, and then decide whether the state courts erred in light of the deferential standards applicable to review of claims adjudicated on the merits.

This court has some concern with the concept of receiving new evidence in a hearing only to "reconsider" its denial of Petitioner's mental retardation habeas claim under the same deferential Section 2254(e)(1) standard previously applied. It seems self-contradictory to claim one is reviewing a ruling under the "deferential review" standard, and then base a decision on evidence that was not, and could not have been, before the state courts.

In the present case, the state District Court did not have the benefit of the June 2002 decision in *Atkins* when conducting the penalty phase of Petitioner's trial. By the time Petitioner's state habeas petition was filed in December 2002 and ruled on in mid-2003, *Atkins* had been decided. Although *Atkins* held that executing the mentally retarded was an excessive

6

punishment under the Eighth Amendment, it left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Atkins,* 536 U.S. 304, 317, 122 S. Ct. 2242, 2250. In Texas, this was accomplished judicially.[5] *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). As *Briseno* was not decided until 2004, the framework it set forth was not available to the state District Court when deciding Petitioner's mental retardation claim in his petition for habeas corpus relief.

The Fifth Circuit's direction to conduct an evidentiary hearing implies that the state court proceedings and findings were insufficient. The state courts had a great deal of evidence before them, and the state habeas trial judge predicted the proper analytical framework that would eventually be adopted. Nevertheless, neither the District Court (the finder of fact) nor the attorneys had both the *Atkins* and *Briseno* opinions before them when the issue of mental retardation was presented and decided. Therefore, it cannot be said that the issue of mental

---

[5]In 2001, by divided votes in both the House and Senate, the Texas Legislature passed a bill banning capital punishment for a person with mental retardation as defined in Tex. Health & Safety Code § 591.003. The bill was vetoed by Governor Rick Perry. A 2003 bill, which would have made mental retardation a mitigating factor for jury consideration during the penalty phase passed the Texas House of Representatives, but foundered in the Senate. Tex. H.B. 614, 78th Leg., R.S. 2003. A 2005 bill which proposed pretrial determination of mental retardation and mirrored the existing state procedures regarding competency and sanity, and would have set an IQ of 70 as a rebuttable presumption of mental retardation also failed. Tex. S.B 231, 78th Leg. R.S. 2005. Similarly, a 2007 bill attempting to establish a statutory framework did not pass. Tex. S.B. 249, 80th Leg., R.S. 2007. Texas Senate Bill 167 was filed on November 10, 2008, the first day for Texas legislators to pre-file bills for the 81st legislative session, and will presumably be taken up in 2009. Among other provisions, the bill would alter the burden of proof somewhat to institute a rebuttable presumption that a Defendant with an IQ of 70 or less is mentally retarded, and also adopts the meaning of "mentally retarded" set out in Tex. Health and Safety Code § 591.003(13). The text of the bill is available at: http://www.legis.state.tx.us/BillLookup/Text/aspx?LegSess=81R&Bill=SB167.

retardation was decided on the merits under current law. Given the importance of the matter, a *de novo* review by this court of the entire record, including the new evidence, is appropriate.

B.     Burden of Proof

The issue of Petitioner's mental retardation is a question of fact. *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006). If this court is to review the decision of the lower court under the deferential Section 2254 standard, Petitioner would only be entitled to relief if he demonstrated that the state court decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Section 2254(d)(2). Petitioner would therefore have the burden of rebutting the state court's factual findings with clear and convincing evidence. *Clark*, 457 F.3d 441, 444.

If *de novo* review is appropriate, the burden of proof is different. Under *Briseno*, a Defendant or habeas Petitioner in a capital case in Texas must demonstrate, by a preponderance of the evidence, that he is mentally retarded.[6] *Briseno*, 135 S.W.3d 1, 12; *see also Woods v. Quarterman*, 493 F.3d 580, 585, n.3 (5th Cir. 2007) (the Texas Court of Criminal Appeals held in *Briseno* that "defendants and petitioners must establish their mental retardation, as defined by either the American Association of Mental Retardation (AAMR) or the Texas Health and Safety Code, by a preponderance of the evidence . . .To the extent that [Petitioner] argues this allocation is inappropriate and that a jury should determine his mental retardation, we have previously rejected that argument."); *Lewis v. Quarterman*, 272 Fed. App'x 347 at *4 (5th Cir. Apr. 1, 2008)

---

[6]*Atkins* specifically stated that each state should develop ways to enforce the restriction on executing the mentally retarded. No case has indicated that any sort of federal common law should be developed or applied. This case was tried in Texas state court, so *Briseno* sets the standard.

(unpublished) ("Texas has placed the burden of proof upon the defendant to show mental retardation by a preponderance of the evidence.") (citing *Briseno*).  The burden of proof is therefore on Petitioner to show by a preponderance of the evidence that he is mentally retarded, as determined according to the standards established for Texas courts in *Briseno.*

### III.  Definition of "Mental Retardation"

A.      The Professional Standards of Measurement

1. *Overview – AAMR and DSM-IV-TR definitions*

In *Atkins*, the Supreme Court cited the 1992 version of the definition of mental retardation promulgated by the AAMR and the similar definition of the American Psychiatric Association (APA), as set out in the DSM-IV-TR.  *Atkins*, 536 U.S. 304, 308, n.3, 122 S. Ct. 2242, 2245.  The 1992 AAMR definition states that:

> Mental retardation relates to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.

AAMR,  Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).[7]  For convenience, this work will be cited as AAMR [page] (9th ed. 1992), while the later edition will be cited as AAMR [page] (10th ed. 2002).

_____

[7]The AAMR revised this definition somewhat in 2002: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18." AAMR 8 (10th ed. 2002).  "Significant limitations in adaptive behavior" are characterized as "performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."  *Id.* at 14.

The DSM-IV-TR formulation referenced by the Supreme Court is similar:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years.

DSM-IV-TR 41 (4th ed. 2000). As the DSM-IV-TR has not been updated since 2000, this remains the current definition.

### 2. *Intellectual functioning*

The DSM-IV-TR further defines "general intellectual functioning" as the intelligence quotient (IQ) which is obtained by assessment with one or more of the standard, individually administered intelligence tests such as the WISC-III; Stanford-Binet, 4th edition[8]; or the Kaufman Assessment Battery for Children. *Id.* "Significantly subaverage intellectual functioning" means "an IQ of about 70 or below (approximately two standard deviations below the mean)." *Id.* The DSM-IV also emphasizes that:

> there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65-75). Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

*Id.* at 41-42. The AAMR formulates the concept of error slightly differently, stating that the standard error measurement (SEM) is:

> estimated to be three to five points for well-standardized measures of general intellectual functioning. This means that if an individual is retested with the same instrument, the second obtained score would be within one SEM (i.e., +/- 3 to 4 IQ points) of the first estimates about two thirds of the time. Thus, an IQ standard score is best seen as

---

[8]Since the DSM-IV-TR was published in 2000, a fifth edition of the Stanford-Binet test has been developed.

bounded by a range that would be approximately three to four points above and below the obtained score. This range can be considered as a "zone of uncertainty" . . . Therefore, an IQ of 70 is most accurately understood not as a precise score, but as a range of confidence with parameters of at least one SEM (i.e., scores of about 66 to 74; 66% probability), or parameters of two SEMs (i.e., scores of 62 to 78; 95% probability) . . . This is a critical consideration that must be part of any decision concerning a diagnosis of mental retardation.

AAMR 57 (10th ed. 2002).

The DSM-IV-TR recognizes four degrees of mental retardation: mild (IQ of 50-55 to approximately 70); moderate (IQ of 35-40 to 50-55); severe (IQ of 20-25 to 35-40); and profound (IQ below 20 or 25). DSM-IV-TR 42 (4th ed. 2000).[9] The mild mental retardation category constitutes the largest segment of those with the disorder, or about 85%. These individuals:

typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.

Id. at 43.

3. *Adaptive behavior*

The DSM-IV-TR characterizes "adaptive functioning" as "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting" and notes that:

---

[9]The practice of classifying individuals with mental retardation into subgroups based on their IQ (mild, moderate, severe, and profound) was dropped in the 1992 AAMR definition, but remains in the DSM-IV-TR. The 1992 AAMR definition classified individuals based on how much support they needed in a particular area (intermittent, limited, extensive, or pervasive) irrespective of his or her IQ. This classification was retained in the 2002 AAMR definition. AAMR 27, 100-01 (10th ed. 2002).

It is useful to gather evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history). Several scales have also been designed to measure adaptive functioning or behavior (e.g., Vineland Adaptive Behavior Scales and the American Association on Mental Retardation Adaptive Scale). These scales generally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains.

DSM-IV-TR 42 (4th ed. 2000). The DSM-IV-TR and 1992 AAMR identified the same adaptive skill areas.[10] The 2002 AAMR changes the adaptive skill behavior classifications slightly, as is seen in the following chart:

| Adaptive Behavior Skill Areas in 2002 AAMR | Representative Skills in 2002 AAMR Definition | Skill Areas Listed in 1992 AAMR Definition |
|---|---|---|
| Conceptual | Language<br>Reading and Writing<br>Money Concepts<br>Interpersonal Skills | Communication<br>Functional Academics<br>Self-Direction<br>Health and safety |
| Social | Interpersonal<br>Responsibility<br>Self-esteem<br>Gullibility (i.e., likelihood of being tricked or manipulated)<br>Naivete<br>Follows rules<br>Obeys laws<br>Avoids victimization | Social skills<br>Leisure |
| Practical | Activities of daily living<br>• Examples include eating; transfer/mobility; toileting; and dressing<br>Instrumental activities of daily living<br>• Examples include meal preparation; housekeeping; transportation; taking medication; money management; and telephone use<br>Occupational skills<br>Maintains safe environment | Self-care<br>Home living<br>Community use<br>Health and safety<br>Work |

[10]Both the DSM-IV-TR and the 1992 AAMR cite the same skill set areas. The AAMR, however, combines "health and safety" into one category while the DSM-IV-TR designates "health" and "safety" as two separate categories. Thus, the AAMR refers to ten categories of adaptive skill behavior while the DSM-IV-TR refers to eleven.

AAMR 42, 82 (10th ed. 2002).   As Petitioner's neuropsychologist Dr. Joan Mayfield and

Respondent's psychologist Dr. Thomas Allen both agreed at the *Atkins* hearing, there is little, if

any, practical difference between the 1992 and 2002 versions of the AAMR mental retardation

definition.  Tr. at p. 7, l. 17 - p. 10, l. 13 (Vol. I).[11]

4. *Onset before age 18*

While the 1992 AAMR, the 2002 AAMR, and the DSM-IV-TR definitions all require

that onset be prior to age 18, "adaptive behavior must be examined in the context of the

developmental periods of infancy and early childhood, childhood and early adolescence, late

adolescence, and adulthood." AAMR 75 (10th ed. 2002).

B.       The Texas Standard  for Determining Mental Retardation

In *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004), the Texas Court of

Criminal Appeals held that Texas courts would follow the criteria set out by the AAMR or by

Tex. Health & Safety Code  §591.003(13) in addressing *Atkins* mental retardation claims.

Specifically, the *Briseno* court held that mental retardation under the AAMR definition

was a disability characterized by: (1) "'Significantly subaverage' general intellectual functioning;

(2) Accompanied by 'related' limitations in adaptive functioning; (3) The onset of which occurs

prior to age 18." *Briseno*, 135 S.W.3d 1, 7.  Tex. Health & Safety Code § 591.003(13) defines

mental retardation as "significantly subaverage general intellectual functioning that is concurrent

with deficits in adaptive behavior and originates during the developmental period." *Id.*

---

[11]The final transcript was not complete at the time this Order was signed.  References to
the transcript of the December 8-10, 2008 mental retardation hearing are to the rough draft and
will be cited as Tr. at p. ___, l. _____ (Vol. ___).  Volume I refers to the December 8 transcript,
Volume II to the December 9 transcript, and Volume III to the December 10 transcript.

In defining "significantly subaverage general intellectual functioning," as the phrase is used in the AAMR definition and in the Tex. Health & Safety Code, the *Briseno* court referenced the DSM-IV-TR definition: "'Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean).' DSM-IV at 39 . . . ." *Briseno*, 135 S.W.3d 1, 7, n. 24. *Briseno* also stated that:

> The adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some other evidentiary factors which fact finders might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder:
>
> [1]     Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time and, if so, act in accordance with that determination?
>
> [2]     Has the person formulated plans and carried them through or is his conduct impulsive?
>
> [3]     Does his conduct show leadership or does it show that he is led around by others?
>
> [4]     Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
>
> [5]     Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
>
> [6]     Can the person hide facts or lie effectively in his or others' interests?
>
> [7]     Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d 1, 8-9.

Petitioner argues strenuously that the *Briseno* factors should not be part of the determination of mental retardation because: (1) the Texas death penalty scheme is unconstitutional since it is judicially created; and (2) even assuming a non-legislative scheme is

14

contemplated by *Atkins*, the *Briseno* factors themselves are unconstitutional because they can include analysis of adaptive behavior factors which occurred after age 18.

As noted above, *Atkins* states that the Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Atkins*, 536 U.S. 304, 317, 122 S. Ct. 2242, 2250. This does not specify which entity should develop the "appropriate way": the legislature or the courts. *See Ex parte Neal*, 256 S.W.3d 264, 271 (Tex. Crim. App. 2008).[12]

*Briseno* has been cited by the Fifth Circuit in at least twenty-four opinions since it was decided in February 2004, and Petitioner admits that none have disapproved of the case. In *Williams v. Quarterman*, 2008 WL 4280315 (5th Cir. Sept. 19, 2008) (unpublished), the court quoted the seven *Briseno* factors in full and affirmed the district court's denial of habeas relief where the district court considered factors such as Petitioner's ability to travel out of state, rent an apartment, do his own laundry, and apply for unemployment benefits on his own. *See also Woods v. Quarterman*, 493 F.3d 580 (5th Cir. 2007) (without specifically referencing the *Briseno* factors, the court affirmed the district court's denial of habeas relief where there was evidence of Petitioner's performance of his job as a short-order cook at a restaurant).

The Fifth Circuit also explicitly stated in *Woods* that: "[Petitioner] argues that *Ex parte Briseno*, relied upon by the state habeas court, is contrary to *Atkins* in the way it allows courts to evaluate limitations in adaptive behavior . . .We find nothing in *Briseno* that is inconsistent with *Atkins* in this regard." *Id.* at 587, n.6. In short, Fifth Circuit case law is clear that *Briseno*

---

[12]Petitioner suggests that *Atkins* requires that the standards adopted must reflect the views of the electorate. While not agreeing that the Supreme Court imposed such a requirement, the court notes that the nine Judges of the Texas Court of Criminal Appeals are chosen in state-wide elections.

remains good law and that courts have the *option* of considering the seven factors in their decision.

More to the point, these seven factors are not concepts judicially created outside of the analytical framework of the AAMR and DSM-IV-TR guidelines used by professionals in the field and cited with approval by *Atkins*. "Adaptive behavior must be examined in the context of the developmental periods of . . . late adolescence, and adulthood." AAMR 75 (10th ed. 2002). The *Briseno* factors are merely examples of the evidence a trial court "might focus upon" when considering adaptive behavior.[13]

The second prong of the AAMR definition used by the *Briseno* court requires limitations in two or more areas of adaptive functioning that are related to the significantly subaverage general intellectual functioning in prong one. *See also* DSM-IV-TR 41 (4th ed. 2000). As shown in the following chart, there is a distinct correlation between the so-called *Briseno* factors and the adaptive limitations set out by the AAMR and in the DSM-IV-TR:

_____

[13]The precise intent of an appellate court opinion and how it should be applied is not always immediately apparent to lower courts that must apply the ruling in light of different factual settings. Texas state district courts do not have law clerks to assist in the sometimes difficult task of determining what kinds of facts should be considered, and how they should be weighed, in analyzing the factors of a new test. It cannot be unconstitutional for the Texas Court of Criminal Appeals to provide some clear, practical examples to guide the lower courts, which are charged with applying its rulings.

| 1992 AAMR/ DSM-IV-TR | 2002 AAMR | *Briseno* factors |
|---|---|---|
| Related limitations in two or more of the following eleven areas: | Significant limitations in adaptive behavior are defined as performance that is at least two standard deviations below the mean of either one of the following three types of adaptive behavior (conceptual, social, and practical) or an overall score on a standardized measure of conceptual, social, and practical skills. The following are representative skills: | Seven evidentiary factors "which fact finders might also focus upon in weighing evidence as indicative of mental retardation": |
| Communication | Conceptual – language and reading/ writing (representative skills) | *Briseno* factors 2, 3, 5, 6, and 7 |
| Self-Care | Social – avoids victimization

Practical – activities of daily living; occupational skills, maintains safe environment. | *Briseno* factor 3 |
| Home Living | Practical – Instrumental activities of daily living; occupational skills. | *Briseno* factors 1 and 4 |
| Social/Interpersonal Skills | Social – interpersonal; avoids victimization; self- esteem; gullibility; and naivete

Practical – maintains safe environment.

Conceptual – self-direction | *Briseno* factors 3, 4, 5, 6, and 7 |
| Use of Community Resources | | |
| Self-Direction | Social – follows rules; obeys laws | *Briseno* factors 2, 3, 6, and 7 |
| Health | Practical – instrumental activities of daily living; maintains safe environment | |
| Safety | Practical – maintains safe environment. | |
| Functional Academic Skills | Conceptual – money concepts; language; reading and writing | *Briseno* factors 1, 5, and 7 |
| Leisure | Practical – Instrumental activities of daily living | *Briseno* factors 2, 3, and 4 |
| Work | Practical – instrumental activities of daily living; occupational skills, maintains safe environment. | *Briseno* factors 2, 3, 5, and 7 |

In short, the seven so-called "*Briseno* factors" are practical examples of evidence that may be pertinent to some of the adaptive limitations described in the AAMR and DSM-IV-TR definitions of mental retardation.  *See* Tr. at p. 79, l. 23 - p. 80, l. 12 (Vol. 1).

## IV.  Analysis

A.     Time Line

Based on the exhibits and testimony presented at the evidentiary hearing, as part of its findings of fact, the court finds that the following events occurred on the dates set out below:

1.     October 26, 1979:     Petitioner's birth date

2.     1986-1990:     Petitioner attended grades K-3 at Grapeland Elementary.  He was six years old when he entered kindergarten in 1986, and ten years old when he left in third grade in 1990.

3.     1990-1994:     Petitioner attended grades 3-6 at Elkhart Elementary.  He repeated third grade, and was eleven years old when he entered grade 4 in 1991.  He left in 1994, at age fourteen, in sixth grade.

4.     January 26, 1994:     Petitioner assessed with WISC-III and TONI-2 by the Anderson County Special Education Co-Op.  He was in sixth grade at Elkhart Elementary at the time (age fourteen).  Resp. Ex. 2 at pp. 58-60.

     A.     Results yielded a Full Scale IQ of 71, a Performance IQ of 72, and a Verbal IQ of 75 on the WISC-III.  *Id.* at p. 59.

     B.     Petitioner obtained a score of 72 on the TONI-2.  *Id.*

     C.     The report generated by the Co-Op also notes, under the heading "adaptive behavior," that "observed behaviors appear to be consistent with the student's measured level of intelligence."  *Id.*

     D.     The report concludes that Petitioner "is currently functioning in the borderline range of overall general intelligence."  *Id.* at p. 60.

5.     1994-1997:     Petitioner attended grades 7-8 at Westwood Junior High (1994-96) and grade 9 Westwood High School (1996-97).  He left school at age seventeen in 1997, when he was in the ninth grade.

6.     October 10, 1995:     Petitioner was tested again by the Anderson County Special Education Co-Op using the WISC-III and TONI-2, as well as the Peabody Picture Vocabulary Test – Revised (PPVT-R) and Expressive One Word Picture Vocabulary Test (EOWPVT). He was fifteen at the time, and in grade 8. Resp. Ex. 5 at pp. 766-70.

    A.     Petitioner scored a 75 on the Verbal IQ, 84 on Performance IQ, and 78 on Full Scale IQ for the WISC-III, as well as an 86 on the TONI-2.

    B.     The report stated that the TONI-2 was considered more accurate for Petitioner, because his verbal section of the WISC-III contained inconsistencies. The score on the TONI-2 was in the "low average range."

    C.     This report also notes, under the heading "adaptive behavior," that "observed behaviors appear to be consistent with the student's measured level of intelligence."

    D.     On the PPVT, he scored a 72. The report indicates that this is in the bottom third percentile, and "indicate the student's level of proficiency in receptive language is below average."

    E.     For the EOWPVT, he also scored a 72, which is in the bottom third percentile. Again, this "indicate[s] the student's level of proficiency in receptive language is below average."

    F.     The report concludes that the results indicate Petitioner "meets the qualifying criteria for Learning Disabled . . . and will be unable to make satisfactory academic progress without special education services."

7.     January 26, 2000:     Murder committed by Petitioner, his brother Lionel, his wife Jennifer, and his cousin Edward.

8.     February 17, 2000:     Petitioner indicted for capital murder.

9.     Throughout 2000:     Petitioner writes to a number of individuals (his brother Lionel and mother Brenda, among others). None of the letters are dated, but most have a postmark (all of which are sometime in 2000). Resp. Ex. 11. The letters indicate some ability to plan and to manipulate others.

| 10. | July 24, 2000: | MRI performed on Petitioner. |
|---|---|---|

| 11. | September 2000: | EEG performed on Petitioner. |
|---|---|---|

12. October 30, 2000:    Report of Dr. Paul Andrews, psychologist retained by Petitioner's attorneys. Dr. Andrews tested Petitioner using the WAIS-III, and found a Verbal IQ of 74; Performance IQ of 73; and Full Scale IQ of 71. Dr. Andrews concluded that this was a "borderline" score that falls at about the third percentile, and that there was a 95% confidence that Petitioner's true IQ was between 68 and 76. Resp. Ex. 14 at p. 5.

13. December 2000:    Petitioner convicted of capital murder.

14. December 18, 2000:    Petitioner arrives on death row. Sometime soon after, he is again tested on the TONI and receives a score of 84. It is unclear whether this was the TONI or TONI-2.

15. January 23, 2004:    Petitioner assessed by Dr. Windel Dickerson. Dr. Dickerson administered the Luria-Nebraska Neuropsychological Battery (LNNB), which apparently predicted a WAIS-III Full Scale IQ of 65.6.[14]

16. October 31, 2008:    Dr. Joan Mayfield (Petitioner's neuropsychologist) performed the WAIS-III and found Petitioner to have a Full Scale IQ of 65, a Verbal IQ of 66, and a Performance IQ of 69. Pet. Ex. 1 at p. 4.

17. November 10, 2008:    Dr. Thomas Allen (Respondent's psychologist) performed the Stanford-Binet-V. He found Petitioner to have a Visual IQ of 75, Non-Visual IQ of 82, and a Full Scale IQ of 77. Resp. Ex. 107 at p. 6.

---

[14]When the state District Court considered the habeas petition, it had before it Dr. Dickerson's affidavit concerning his testing of Petitioner in March 2003, which the court found to be unpersuasive and untimely. Dr. Dickerson's March 2003 testing results were not submitted to this court at the December 2008 evidentiary hearing. When his state habeas petition was on appeal, Petitioner requested consideration of Dr. Dickerson's January 2004 testing from the Texas Court of Criminal Appeals. The motion was ultimately denied, as the court found it did not have statutory authority to consider additional evidence. *Ex parte Simpson*, 136 S.W.3d 660, 667 (Tex. Crim. App. 2004). Those results are in evidence in this court, but neither side relied upon them at the hearing.

18.     November 28, 2008:  Dr. Kendall Jones (Petitioner's neuroradiologist) assessed
                            Petitioner's MRI images and found "a variation of normal anatomy
                            (a thickened but otherwise normal skull) but no evidence of a mass
                            lesion or congenital brain malformation."  Resp. Ex. 109 at p. 2.

B.      Discussion

        1. *Intellectual functioning*

        *Briseno* holds that a court should determine mental retardation using the criteria of the

AAMR or of Tex. Health and Safety Code § 591.003(13).  As discussed above, and as agreed by

Dr. Mayfield (Petitioner's expert) and Dr. Allen (Respondent's expert), these standards are

essentially equivalent to each other and to the standard set out in DSM-IV-TR.  The criteria for

the "intellectual functioning" prong of a mental retardation classification is approximately two

standard deviations below the mean, considering the standard error of measurement for the

specific assessment instruments used and the instruments' strengths and limitations.  The court

finds that although Petitioner is "borderline," he does not have "significantly subaverage

intellectual functioning" as defined by the Texas statute, the AAMR, or the DSM-IV-TR.

        Both the DSM-IV-TR and the AAMR emphasize that any IQ score is a range, and that it

is impossible to pinpoint any one number as "the" score.  On the WISC-III, for example, the

SEM is +/- 3.2 for the Full Scale IQ.  Petitioner's Full Scale IQ score of 71 on the WISC-III at

age 14, therefore, becomes a score somewhere in the range of roughly 65 and 77.  Even then,

there is only a 95% probability that Petitioner's true IQ is within that range.  Consequently, there

is a 5% chance that his true IQ may be higher or lower than the range calculated from a single

test.[15]

_____

        [15]At one point Respondent's presentation seemed to imply that a high score on a
particular test was a "floor," and that performance below that floor demonstrated malingering.
Tr. at p. 62, ll. 6-14 (Vol. 2).  An analogy was made to "someone who is acting as though they

What is notable in this case is the consistency of Petitioner's early IQ scores. Between the ages of 14 and 20 he was given three tests which yielded a Full Scale IQ score:

| Test | Date | Age | Full Scale IQ Score |
|------|------|-----|---------------------|
| WISC-III | January 1994 | 14 | 71 |
| WISC-III | October 1995 | 15 | 78 |
| WAIS-III | October 2000 | 20 | 71 |

Additionally, by the age of 21, Petitioner had been tested twice with the TONI-2, once with the PPVT-R, and once with the EOWPVT. He was also tested once immediately after arriving on death row with either the TONI or TONI-2:

| Test | Date | Age | Score |
|------|------|-----|-------|
| TONI-2 | January 1994 | 14 | 72 |
| TONI-2 | October 1995 | 15 | 86 |
| PPVT-R | October 1995 | 15 | 72 |
| EOWPVT | October 1995 | 15 | 72 |
| TONI or TONI-2 | December 2000 | 21 | 84 |

As to the tests Petitioner took after age 21, the court places little weight on Dr. Dickerson's January 2004 score. Dr. Dickerson administered the LNNB, which is primarily used to assess cognitive disorders and determine whether the examinee suffers from brain damage. Dr. Jones, an eminently qualified neuroradiologist who was retained at Petitioner's request, put the issue of physical brain damage to rest when he concluded that the MRI images which had

---

have no arms but they are obviously throwing you a curve." Tr. at p.110, at ll. 12- 18 (Vol. 2). This is a gross oversimplification of the concepts involved. Direct observation of a subject throwing a ball does not involve statistical interpretation of the results of a standardized test. The court assumes that there was a lack of communication between the Respondent's expert and counsel, rather than an attempt to mislead.

previously raised questions regarding whether Petitioner suffered from brain damage were actually nothing more than a thick skull and fat deposits. *See* Resp. Ex. 109. There is no evidence of physical injury or trauma to the brain that would give rise to mental retardation or other dysfunction. Neither side relied upon Dr. Dickerson's results during the evidentiary hearing.

Certain issues are apparent when evaluating the testing conducted in late 2008, immediately prior to the evidentiary hearing. Dr. Mayfield noted that the conditions under which she conducted her tests were not ideal, which could partly account for the low WAIS-III Full Scale IQ score she measured. Even so, that score was not statistically so far below the consistent range Petitioner had previously obtained as to call those earlier tests and scores into question. Additionally, the court must recognize that Petitioner had a very strong incentive to malinger in light of *Atkins* and *Briseno* when being tested by Drs. Mayfield and Allen in 2008.[16]

Finders of fact are cautioned to consider the possible bias of an expert witness "including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly as an expert witness and his income from such testimony represents a significant portion of his income." Fifth Circuit Pattern Jury Instructions - Civil Cases, Pattern Instruction 2.19, pg. 23 (2006); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995) (one, but not the only, factor to consider in determining reliability of expert testimony is whether it is based on research conducted independently of the litigation). Both Drs. Allen and Mayfield were retained to testify in this particular case. Dr. Allen admitted he has

---

[16]The score of 71 on the October 2000 test administered by Dr. Andrews was after the murder took place, but the possibility of any potential bias against Petitioner is reduced because Dr. Andrews was retained by Petitioner's counsel.

tested many defendants for the State of Texas, but could not name one he found not to be malingering. While Dr. Mayfield had not been involved in as many cases involving prisoners, she had, to her credit, reached different conclusions for different test subjects.

Fortunately, a decision in this case does not depend solely on an evaluation of the credibility of experts who first met and evaluated Petitioner eight years after the murder. There is ample evidence of Petitioner's IQ before the *Atkins* decision, at a time when the importance to Petitioner of his IQ score was not so apparent. Between January 1994 (age 14) and December 2000 (age 21), his scores on a variety of tests, administered at various times by different professionals placed him within, not at or below, two standard deviations of the mean for each test he took.

Petitioner's academic grades and test results also support these conclusions. Petitioner was tested using the Stanford Achievement Test (SAT) twice in third grade[17] and his normal curve equivalent (NCE)[18] scores in all five areas (total reading, total math, total language, basic battery, and complete battery) were well above those expected for an IQ of 69, 70 or even 75. Resp. Ex. 105, at pp. 2-3. In fourth, fifth, and sixth grades, Petitioner participated in the Norm-Referenced Assessment Program for the state of Texas. Again, his NCE scores in the areas tested were in all cases well above those expected for an IQ of 70 or 75. *Id.* at pp. 4-5.

_____

[17]As noted elsewhere, Petitioner repeated the third grade.

[18]The normal curve equivalent, or NCE, was developed for the United States Department of Education by the RMC Research Corporation in 1976 and is a test score based on a percentile rank. The NCE measures where a student falls on a normal curve, indicating the student's rank compared to other students on the same test. *See* C. Mertler, Using Standardized Test Data to Guide Instruction and Intervention 3 (2002).

Although grades and achievement test scores do not measure IQ, Petitioner's performance in school and on such tests indicate that his IQ test scores were not abnormally high or aberational. The court finds that Petitioner's IQ is higher than two standard deviations below the mean.

2. *Adaptive behavior*

An IQ score alone does not determine whether an individual will be classified as mentally retarded. These scores are a statistical measure, with a range of error. Even for a test with an SEM of 3, for which one is 95% confident that an individual's true IQ will fall within two SEMs of his test score, there is a possibility that the test score may overstate or understate actual IQ by more than six points. A person with an IQ below 70 may not be mentally retarded. *See* DSM-IV-TR 41-42 (4th ed. 2000). In determining whether one is mentally retarded, it is therefore necessary to examine what are labeled by the AAMR as "limitations in adaptive behavior" and by the Texas Health and Safety Code § 591.003(13) as "deficits in adaptive behavior."

The Texas Legislature defined "adaptive behavior" as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." Tex. Health and Safety Code § 591.003(1). The 1992 AAMR definition characterized the second prong of the mental retardation test as "limitations [related to significantly subaverage intellectual functioning] in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." AAMR 5 (9th ed. 1992). The DSM-IV-TR definition is similar, requiring "significant limitations in adaptive functioning in at least two" of the same skill areas cited in the AAMR definition. DSM-IV-TR 41 (4th ed.

2000); *see also* <u>AAMR</u> 8, 14 (10th ed. 2002) (significant limitations in adaptive behavior that are characterized as "performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."). As agreed by Drs. Allen and Mayfield, these are substantially similar formulations.

Dr. Mayfield stated at the hearing that she considers the areas in which Petitioner's limitations are most pronounced to be functional academics; home living (including money handling); and work. Nothing in the record would support a finding of significant limitations or deficits in other areas, so the court will focus on the evidence concerning these three.

     a. **Functional academics**

With respect to functional academics, Petitioner's family members testified that they considered him slow and his sisters had to help him with homework when he was still in school. One of Petitioner's seventh grade teachers, Ms. Rosa Huffman, testified that her impression of Petitioner was that he was "bored, doesn't really care what's going on," "didn't care that much about class work or what we were doing," and that the reason for this was "he had felt like through the years that he had not been successful." Tr. at p. 222, ll. 19-20; p. 223, ll. 2-3; ll. 12-13 (Vol. 2). She also testified that Petitioner was placed in some classes during seventh grade that were tutorial or remedial. Tr. at p. 225, l.6 - p. 228, l. 16 (Vol. 2).

The records from the Anderson County Co-Op, which performed Petitioner's IQ testing while he was in school, state that at age 14, Petitioner was "currently functioning in the overall Borderline Range of overall general intelligence, according to both the WISC-III and TONI-2. Based on the results of this assessment, Danielle does not meet the eligibility criteria for a

handicapping condition." Resp. Ex. 2 at p. 60. This testing and evaluation was performed by a team that included an educational diagnostician who had a Master of Education degree. *Id.*

At age 15, Petitioner was tested and evaluated again by different educators, including another educational diagnostician with an M. Ed. Resp. Ex. 5 at p. 6770. The Co-Op records state that Petitioner "meets the eligibility criteria for Learning Disabled in that assessed intellectual ability is above the mentally retarded range . . . ." *Id.* at p. 6772. On both testing occasions, the Co-Op records state, under the heading "Adaptive Behavior," that Petitioner's "observed behaviors appear to be consistent with the student's measured level of intelligence." Resp. Ex. 2 at p. 59; Resp. Ex. 5 at p. 6768.

With the exception of his first time through third grade, the grades received in third through sixth grade were consistently above failing.[19] Resp. Ex. 105, at p. 7 (average for year: 62.4 [third grade initial, spring semester only]; 70.9 [third grade repeat]; 69.7 [fourth grade]; 75.1 [fifth grade]; and 73.2 [sixth grade]).[20] While his grades did decline in seventh and eighth grades, *see* Resp. Ex. 4, at pp. 3-6, these were also the years during which Petitioner was evaluated by the Anderson County Co-Op diagnosticians who did not find him to be mentally retarded.

Finally the court considers the letters Petitioner wrote and the evidence of actions he took after being imprisoned in 2000. These indicate an ability to plan and some capacity to adapt.

---

[19]The court has removed the physical education scores from the averages computed by Dr. Hughes, under the assumption that high grades based on one's ability to bring gym clothes to class or throw a ball may not be the most accurate reflection of functional academic ability. This is not to say that these grades might not reflect other aspects of adaptive behavior.

[20]All three of Petitioner's sisters testified that they often helped him with homework. However, LaTonya, Kenya, and Tangela did not take Petitioner's achievement tests for him.

Petitioner questions the weight to be given to these letters, arguing that other inmates may have helped him write some of them. At the very least, it seems clear that someone edited the letter attributed to Petitioner on a website and translated it into German. Likewise, it is true that prison is a very structured environment where it might be easier for some mentally retarded persons to cope. If the burden of proof was on Respondent, this evidence, without more, would be insufficient. However, it does support the substantial evidence concerning Petitioner's adaptive behavior in the years before the murder. Under current law, the burden is on Petitioner. The unsupported questions Petitioner raises about this evidence do not assist him in meeting that burden.

Based on all of the evidence, the court finds that Petitioner did not have adaptive deficits or limitations in the area of functional academics to the extent that would support a finding of mental retardation.

b. **Home living and work**

Petitioner's family members all testified that they considered him slow, had to help him with homework when he was still in school, and that he had a spotty work history. They also testified as to his musical skill, ability to play the drums and guitar, ability to sing without sheet music, and the fact that he was capable of doing household chores. Petitioner's sister Tangela Bolton testified that Petitioner seemed to dislike doing manual labor, and would try to get out of chores. Tr. at p. 191, l. 22 - p. 192, l.5 (Vol. 2). The conclusion that he simply did not like to work is also supported by the testimony of his family that he had little trouble obtaining jobs, but would soon after quit, ask for time off, not show up, or be unable to meet the demands of the job. *See* Tr. at 153, ll. 12-17; p. 154, l. 7 - p. 155, l. 2; p. 155, ll. 15-25; p. 173, ll. 2-16; p. 191, l. 10 - p. 192, l. 12; p. 215, ll. 14-17 (Vol. 2). Tangela also testified that Petitioner babysat his younger

siblings for short periods of time, and was a good cook.  Tr. at p. 192, ll. 15-23; p. 193, l. 22 - p. 194, l. 4 (Vol. 2).

With respect to work and money management, Dr. Mayfield testified that Petitioner had difficulty with counting change and understanding why deductions were taken from his paycheck, did not understand social security benefits, and could not make out a check or money order.  *See* Tr. at p. 186, l. 8 - p. 189, l. 2 (Vol. 1).  At the same time, Petitioner understood the purpose of money orders, Tr. at p. 189, ll. 4-11 (Vol. 1), and had no problem going into stores and purchasing things. Tr. at p. 189, ll. 12-18 (Vol. 1).  Rather than deficits in adaptive behavior demonstrated by an inability to handle money, this evidence also supports the conclusion that Petitioner just did not care about money.  *See* Tr. at p. 190, ll. 18-22 (Vol. 1).  As discussed above, he was rarely working or bringing in a paycheck, so the money he was handling was likely often not his own.  Dr. Mayfield agreed at the hearing that this behavior could be an indication of the phenomenon, relatively common among teenagers, to pocket the change when their parents give them money.  Tr. at p. 191, ll. 12-20 (Vol. 1).

Petitioner's behavior points to poor money management, as he often ran out of money because he was buying beer and cigarettes.  Tr. at p. 192, l. 16 - p. 193, l. 10 (Vol. 1).  However, Petitioner did not have a good example set for him at home with respect to living on a budget. Tr. at p. 193, ll. 13-16 (Vol. 1).  There was discussion of the fact that Petitioner started a lawn care business at some point, and used the money he made to buy supplies for his child.  He contributed to the household bills when living with his Aunt Lizzie, and made money from selling drugs and fighting bulldogs.  Tr. at p. 194, ll. 15-25; p. 195, ll. 17-21; p. 195, l. 24 - p. 196, l. 4 (Vol. 1).

While Petitioner does not make the best choices, a preponderance of the evidence does not support a finding of deficits or limitations in adaptive behavior in home living, money handling, or work to an extent that would support a finding of mental retardation. To the contrary, the court finds that Petitioner does not have such deficits or limitations.

3. *Onset before age 18*

The AAMR definitions, Tex. Health and Safety Code §591.003(13), and the DSM-IV-TR criteria all require that "onset" occur before age 18. As already noted, the WISC-III was administered to Petitioner at ages 14 and 15, with Full Scale IQ scores of 71 and 78, respectively. His academic grades and achievement test scores, all obtained before age 18, do not indicate onset of mental retardation before that age. The academic records and testimony of his family do not indicate the onset of significant deficits or limitations in adaptive behavior or functioning before age 18.

Petitioner's IQ testing before he was 21, his academic records, and his adaptive behavior as testified to by his family and teacher carry more weight in this regard than the opinions of Drs. Mayfield and Allen. Although Dr. Mayfield performed a thorough and careful evaluation, Petitioner was twenty-nine years old by the time she evaluated him, and had been in the unusual and highly structured environment of death row for eight years. Dr. Allen's opinion suffers from the same lack of opportunity to evaluate Petitioner when he was young. The court also finds it somewhat fantastic that Petitioner could simultaneously achieve one of his highest Full Scale IQ scores on the test administered by Dr. Allen, and, as Dr. Allen suggests, also be malingering.

## V. Conclusion

Professionals who evaluated Petitioner earlier in his life consistently referred to him as "borderline." Resp. Ex. 2 at p. 59- 60 (Co-Op testing at age 14); Resp. Ex. 5 at p. 6767 (Co-Op

testing at age 15); Resp. Ex. 15 at p. 36, ll. 17-21 (2000 trial testimony of Dr. Paul Andrews). Even though IQ testing and evaluation of adaptive limitations involves ranges, the professional organizations and the courts have adopted standards or criteria, which establish a cut-off point. No matter which criteria are chosen, there will be some individuals who are very close to the border of the cutoff – even if only slightly higher. Saying that a Defendant should be classified as mentally retarded simply because he or she is "borderline" would make the cutoff, which is already based on an evaluation of ranges, impossibly vague. There will always be a Defendant who is close to, but just above, the level of the last person found to be mentally retarded who could therefore be termed "borderline." That Defendant would then be in a new "borderline" sub-category of the classification of mentally retarded. The concept of "borderline" would swallow any definition or standard.

Tests of Petitioner by several different practitioners, using many testing instruments, over a period of six years consistently resulted in scores that placed him within, and not at or below, two standard deviations from the mean. His grades and achievement tests were above what would be expected in someone who was limited to the extent of being mentally retarded. Professional educators and diagnosticians found him to be borderline, but not mentally retarded. While the testimony of his family and his teacher indicates he was "slow," there was no evidence presented of any limitations that could be classified as "significant" or "substantial," as those terms are understood in the context of the AAMR, DSM-IV-TR, and Tex. Health and Safety Code § 591.003(13) definitions of mental retardation.

For the reasons set out above, and based upon Petitioner's academic records, IQ testing results, the testimony of Petitioner's family members and teacher Ms. Huffman, the exhibits, and the expert reports and testimony presented at the evidentiary hearing, the court finds that

Petitioner has not proven by a preponderance of the evidence that he is mentally retarded, under the criteria set out by: (a) Texas Health and Safety Code § 591.003; (b) the American Association on Mental Retardation in the 1992 or 2002 versions of <u>Mental Retardation: Definition Classification, and System of Support</u>; or (c) the American Psychiatric Association in <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 2000).

Therefore, the claims in Petitioner's petition for writ of habeas corpus, based upon his allegation of mental retardation are **DENIED.**

Because Petitioner has raised a number of issues, and because the standard of review or the burden of proof may change while this case is on appeal, the court makes the following additional findings:

1.   If, as argued by Respondent, it was intended that this court was to conduct an evidentiary hearing, and review the state courts' decisions based on evidence that was not before them, then the court finds that Petitioner has not shown by clear and convincing evidence that the decisions of the state courts concerning the issue of mental retardation were based on an unreasonable determination of the facts.

2.   The court finds by clear and convincing evidence, but not beyond a reasonable doubt, that Petitioner is not mentally retarded under the criteria set out by: (a) Texas Health and Safety Code § 591.003; (b) the American Association on Mental Retardation in the 1992 or 2002 versions of <u>Mental Retardation: Definition Classification, and System of Support</u>; and (c) the American Psychiatric Association in <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 2000).

4.   The court finds by clear and convincing evidence, but not beyond a reasonable doubt, that that Petitioner is "borderline"; that is, close to, but above, the classification of "mentally

retarded" under the criteria set out by: (a) Texas Health and Safety Code § 591.003; (b) the American Association on Mental Retardation in the 1992 or 2002 versions of <u>Mental Retardation: Definition Classification, and System of Support</u>; and (c) the American Psychiatric Association in <u>Diagnostic and Statistical Manual of Mental Disorders </u>(4th ed. 2000).

So **ORDERED** and **SIGNED** this **8**  day of **January, 2009.**

_____
Ron Clark, United States District Judge

<u>**APPENDIX**</u>

Three of the tests Petitioner took are generally considered to yield an IQ score or equivalent.  These are the Stanford-Binet-V; WAIS-III; and WISC-III:

**Stanford-Binet-V** – tests fluid reasoning; knowledge; quantitative reasoning; visual-spatial processing; and working memory using ten subtests.  The test is designed for individuals from ages two to adulthood. The test yields a Non-Verbal IQ (combining the five non-verbal subtests), a Verbal IQ (combining the five verbal subtests), and a Full Scale IQ score that combines all ten subtests.  <u>Stanford-Binet Intelligence Scales</u> (5th ed. 2003).  The SEM for the previous edition of the test, the Stanford-Binet IV, was reported to range from 1.60 for adults to 3.58 for young children.  <u>AAMR</u> 62 (10th ed. 2002).

**Wechsler Adult Intelligence Scale, 3rd edition (WAIS-III)** – based on the same concepts as the WISC-III (see below), but is used to assess the intelligence of individuals ranging from sixteen to eighty-nine years.  The standard error of measurement (SEM) for the Full Scale IQ is, on average, 2.3, although this varies between 1.98 and 2.58 depending on the age group being tested.  As with the WISC-III, the WAIS-III yields Verbal, Performance, and Full Scale IQ scores.  <u>AAMR</u> 61 (10th ed. 2002).

**Wechsler Intelligence Scale for Children, 3rd Edition (WISC-III)** – an individually administered test designed for individuals aged six years to sixteen years, eleven months.  It yields three composite scores: the Verbal IQ, Performance IQ, and Full Scale IQ.  The WISC-III was normed on a standardization sample of 2,200 children from the United States; overall race or ethnicity was balanced to reflect racial or ethnic group proportions from the 1980 Census survey.  Subtest reliability tends to be higher for the verbal subtests than for the performance subtests, but all of the reported reliability indices for the three IQ scores exceed .90.  The SEM for the Full

Scale IQ score is 3.2, meaning that there is a 95% confidence that an individual whose tested IQ is 65 has a true IQ somewhere between +/- 1.96 SEMs, or roughly between 59 and 71. <u>AAMR</u> 60-61 (10th ed. 2002).[21]

Another test used to measure IQ, not administered to Petitioner, is the **Kaufman Assessment Battery**. This test is used on individuals aged 2.5 through 12.5 years and yields four global scale scores, with the Mental Processing Scale being essentially equivalent to an IQ score. <u>AAMR</u> 62 (10th ed. 2002).

There are also a number of tests that have been developed to test other aspects of intelligence or ability, the scores of which are sometimes considered to be equivalent, or related, to a subject's IQ score. The EOWPVT, LNNB, PPVT-R, and TONI-2 were all administered to Petitioner:

**Expressive One-Word Picture Vocabulary Test (EOWPVT)** – an individually administered test that provides an assessment of an individual's English speaking abilities. The examiner will present the examinee with a series of illustrations depicting objects, actions, or concepts, and the examinee is asked to name each illustration. The items become progressively more difficult over time. The EOWPVT was updated in 2000. *See* <u>Expressive One-Word Picture Vocabulary Test</u> (Brownell ed. 2000).

**Luria-Nebraska Neuropsychological Battery (LNNB)** – used to diagnose cognitive deficits, including lateralization and localization (i.e., left frontal lobe, right frontal lobe, etc.)

---

[21]The Stanford-Binet and WAIS-III/WISC-III tests do not directly correlate. For example, a fixed IQ score of 70 on a Wechsler scale will identify 2.28% of the population as potentially having mental retardation, while a Stanford-Binet-IV score of 70 will identify slightly more than 3% of the population as potentially having mental retardation. It is also often suggested that the Stanford-Binet is more challenging than Wechsler tests. <u>AAMR</u> 58 (10th ed. 2002).

brain impairment and is available in two forms.  *See* Golden *et al*, "Luria-Nebraska Neuropsychological Battery" *in* Understanding Psychological Assessment: Perspectives on Individual Differences (Dorfman ed. 2001).

**Peabody Picture Vocabulary Test – Revised (PPVT- R)** – an individually administered test of hearing vocabulary, which is available in two different forms.  Each form contains five training items followed by 175 test items arranged in order of increasing difficulty.  Each item has four simple black-and-white illustrations that are arranged in a multiple choice format.  The examinee selects the picture considered to best illustrate the meaning of a stimulus word presented orally by the examiner.  *See* Peabody Picture Vocabulary Test – Revised (1981).  Since Petitioner was tested, the PPVT-R has been updated and supplanted by the PPVT-III.  *See* Peabody Picture Vocabulary Test, 3rd Edition (1997)

**Test of Non-Verbal Intelligence-2 (TONI-2)** – a language-free measure of abstract problem solving ability which may be used with individuals ages five through eighty-five years old.  It tests a non-verbal IQ.  Test items are presented in an easel-style picture book, and six training items precede the fifty-five actual items on both forms of the test.  The examiner will pantomime or act out instructions, and the examinee points or makes some other meaningful response to indicate his or her choice.  Problem types include simple matching, analogies, classification, intersections, and progressions.  *See* Test of Nonverbal Intelligence (1990).

Finally, there are scales that have been developed to assess adaptive behavior:

**AAMR Adaptive Behavior Scales (ABS)** – found in two versions: the school and community version (ABS-S:2) and the residential and community version (ABS-RC:2).  The former is used to identify students who are significantly below their peers in adaptive functioning for purposes of diagnosis and assesses the effects of intervention programs.  The ABS-S:2

provides norms through age 21.  The ABS-RC:2 was developed to be appropriate for older individuals, but does not fit within the 2002 AAMR criteria for a diagnosis of mental retardation. However, it has historically provided relevant information for assessing changes in individual functioning over time.  <u>AAMR</u> 88-89 (10th ed. 2002)

    **Revised Vineland Adaptive Behavior Scales (VABS)** – consists of three scales: a survey form (Vineland-S); an expanded form (Vineland-E); and a classroom form (Vineland-C). The first two forms utilize a format where data is gathered through interviews with parents or guardians, while the Vineland-C is completed by the teacher in a relatively brief period of time. <u>AAMR</u> 88 (10th ed. 2002).